**BOEING AIRPLANE CO. v. AERONAUTI-
CAL INDUSTRIAL DIST. LODGE NO.
751, OF INTERNATIONAL ASSN. OF
MACHINISTS et al.**

Civ. No. 1991.

United States District Court
W. D. Washington, N. D.

June 12, 1950.

Holman, Mickelwait, Marion, Prince & Black, Lowell P. Mickelwait, James E. Prince, DeForest Perkins, Seattle, Washington, for plaintiff.

Morrissey, Eagen & Walsh, and John E. Hedrick, Seattle, Washington, for defendant, Aeronautical Industrial District Lodge No. 751 of International Ass'n of Machinists.

Lee Olwell, Seattle, Washington, Rummens, Griffin & Short, Seattle, Washington, Jerome Y. Sturm, New York City, for defendant, International Ass'n of Machinists.

CARTER, District Judge.

This is an action for damages for breach of contract, in which the plaintiff contends that the defendants breached an agreement not to strike contained in the labor relations contract between plaintiff and defendants.

Jurisdiction in this court exists by reason of the Labor-Management Relations Act of 1947, § 301, Act of June 23, 1947, c. 120 Title III, § 301, 61 Stat. 156, Title 29 U.S.C.A. § 185, which expressly states "suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter * * * may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. * * *"

The questions to be decided arise on motions for summary judgment and motions to dismiss. The defendant Aeronautical Industrial District Lodge No. 751 of the International Association of Machinists will be hereinafter referred to as "Lodge 751" and the defendant International Association of Machinists will be hereinafter referred to as the "International."

A brief statement of the facts is in order.[1]

On January 5, 1944, a labor relations agreement was entered into between the plaintiff's predecessor, Boeing Aircraft Company on the one part and the International and Lodge 751 on the other. On March 16, 1946, the duration of the contract was extended by an amendment to Art. XIII reading as follows: "This agreement shall be and remain in full force and effect from the 16th day of March 1946 to the 16th day of March 1947, and thereafter until a new agreement has been reached by the parties either through negotiation or arbitration."

The agreement contains Article XI, "Work Stoppage." After March 16, 1946, and during the period mentioned herein, it read as follows:

"Section A. Strikes and Lockouts

"1. During the life of this agreement no strikes shall be caused or sanctioned by the Union, and no lockouts shall be made by the Company. Any action of the employees in refusing to go through a picket line, in case of an officially declared strike by some Union directly working on the job, if said strike is sanctioned by Aeronautical Industrial District Lodge No. 751 of the International Association of Machinists, shall not constitute a violation of this clause of the Agreement.

"2. The Union specifically directs its members individually and collectively not to engage in strikes, walkouts, sitdowns, slowdowns, or any other form of work stoppage unauthorized by the Union. In the event that strikes, walkouts, sitdowns, slowdowns or any other form of work stoppage occurs, the parties agree to take corrective action with a view toward preventing a recurrence of such incident."

The year extension period ended March 16, 1947; thereafter the parties continued negotiations in an attempt to reach a new agreement. What transpired after March 16, 1947 is material to some of the issues in the case. The defendants claim that the Company failed to bargain in good faith and that the Company refused to submit the matters in dispute in the proposed new agreement to arbitration unless the Company could make the final decision on who the arbiters were to be. This the Company denies.

---

1. The facts may be found in some detail in Boeing Airplane Co. et al. v. National Labor Relations Board, D.C.Cir., 1949, 174 F.2d 988.

On April 22, 1948 at 12:30 a. m., some 13 months after the end of the one year extension provided for in the agreement, a work stoppage occurred at the Boeing plants in and around the Seattle area. It is the plaintiff's contention that this was in violation of the provisions of the written agreement in Article XI, providing "during the life of this agreement no strike shall be caused or sanctioned by the Union * * *"

At 10:30 a. m., on April 22, the plaintiff, through A. F. Logan, its Director of Industrial Relations, sent the following letter to the President of Lodge 751:

"Boeing Airplane Company
"Seattle 14, Washington
"April 22, 1948
"Mr. Harold J. Gibson, President
"Aeronautical Industrial District Lodge
No. 751
"5502 Airport Way
"Seattle, Washington
"Dear Mr. Gibson:
"The strike which began last night and which is now continuing at the Seattle plants of the Company and which the union caused and sanctioned is in direct violation and repudiation of the collective Bargaining Agreement dated January 5, 1944, as amended March 16, 1946, between Boeing Aircraft Company and Aeronautical Industrial District Lodge 751 and International Association of Machinists.

"By reason of this strike, you are hereby notified that the agreement referred to above is terminated and at an end.
                    "Yours very truly
                    "/s/ A. F. Logan
                    "A. F. Logan, Director
"AFL/j          Industrial Relations"[2]

It is the contention of the defendants that by this letter the Company, as of 10:30 a. m., April 22, terminated and rescinded

the labor relations agreement and that after that date and hour, the Company has no right to sue for breach of the agreement.

On April 28, 1948, the International sanctioned the strike but only after the Company had refused to meet with representatives of the International who came to Seattle for that purpose. This aspect of the case will be discussed later.

The proceedings leading to the Circuit Court decision in 174 F.2d 988 should be summarized. Following the work stoppage on April 22, 1948, Lodge 751 made a complaint to the National Labor Relations Board, charging the Boeing Airplane Company with an unfair labor practice in failing and refusing to recognize and bargain with Lodge 751 following the strike. The Board investigated and instituted proceedings, as a result of which a hearing was had in which Lodge 751 participated [3] and following the hearing the Board determined that the Company had been guilty of an unfair labor practice and issued a cease and desist order. The Company filed its petition for review in the Court of Appeals for the District of Columbia. That court in 174 F.2d 988 set aside the order of the Board on the ground that the contract was still in effect on April 22, 1948, and that the strike was unlawful, hence the Company was justified in not recognizing Local 751 as the legal bargaining agency after that date.

All facts necessary for a determination of the issues before the Board were included in a written stipulation entered into between the Company, counsel for the Board and Lodge 751. These were the stipulated facts referred to by the Court of Appeals in its decision. Both parties concede that the stipulation is still effective and various portions of it are before the court in this action through answers to interrogatories and requests for admissions.

2. It was stipulated that the letter was sent by the plaintiff Company and was received by Lodge 751 on or about 10:30 on April 22, 1948.

3. The plaintiff contends the International collaborated with Lodge 751 and with the counsel for the Board in preparing and conducting the proceedings before the Board, and that one of the attorneys who participated in the oral argument before the Board on behalf of Lodge 751 was counsel for the International. The International filed its brief as amicus curiae in the Court of Appeals case.

The plaintiff's motion is for summary judgment as to all issues except damages and is based upon the aforementioned decision of the United States Court of Appeals in Boeing Airplane Co. et al. v. National Labor Relations Board, D.C.Cir., 174 F.2d 988 and the finding and holding in that case, 174 F.2d page 991, "that the strike was not a lawful strike because of its (Lodge 751) failure to comply with Section 8(d) of the Act". National Labor Relations Act, 29 U.S.C.A. § 158(d). The Company further contends that the decision in 174 F.2d 988 is res adjudicata on the following matters, at issue in the present action—

(1) That the labor relations agreement between the plaintiff Company and the International and Lodge 751 was in full force and effect on April 22, 1948, the date of the strike.

(2) That the strike was unlawful and a breach of the contract.

The motion to dismiss on the part of Lodge 751 and the International are identical. The motion is made upon the ground that "the amended complaint fails to state a claim against the defendant * * * upon which relief can be granted." The motion for summary judgment of both Lodge 751 and the International is based upon the following grounds, identical as to the first four propositions.

"1. The purported contract sued upon and in evidence herein[4] is only a contract for a contract and not one enforceable in law.

"2. The purported contract sued upon and in evidence herein is so indefinite and uncertain that it is not enforceable in law.

"3. The purported contract sued upon and in evidence herein was not in full force and effect on April 22, 1948.

"4. Plaintiff, by its letter of April 22, 1948 * * * terminated and put an end to and rescinded the contract. That by such rescission, plaintiff cannot legally sue upon the contract for damages * * *"

The motion of the International contains also a fifth ground.

5. Defendant International did not breach the purported contract sued upon and in evidence herein.

### The Questions for Determination

As a result of these motions, there arises the following questions for decision:

(1) Was the labor relations agreement in effect on April 22, 1948?

(a) Is the decision in Boeing Airplane Co. v. National Labor Relations Board, D.C.Cir., 174 F.2d 988, res adjudicata or binding on this issue or any other issue in the case at bar?

(b) Was the labor relations agreement only a contract for a contract and not one enforceable in law?

(c) Was the labor relations agreement so indefinite and uncertain as to "duration" that it is not enforceable in Law?

(d) Was the labor relations agreement terminable on notice after a reasonable period of time so that it was not in full force and effect on April 22, 1948?

(2) What interpretation is to be placed upon the labor relations agreement between the parties, insofar as the obligations of the defendants are concerned, and particularly as to whether or not their obligation is joint or several?

(3) Did the Company breach the labor relations agreement prior to April 22, 1948, by failing to bargain, negotiate or arbitrate in good faith with the defendants, as alleged by them, and if so, did this constitute a material breach of the agreement?

(4) If the labor relations agreement was in force and effect on April 22, 1948, was the work stoppage a breach of the no-strike clause, and was the breach a material one?

(5) What was the legal effect of the Company's letter of April 22, 1948? Was the letter an election by the Company to rescind the contract, thereby barring the plaintiff from maintaining this action?

(6) If the Company's letter of April 22 was not an election to rescind, did the Company thereafter breach its agreement with the International by refusing to ne-

---

4. The contract was received in evidence at the pre-trial hearing.

gotiate as alleged by the International, and did this alleged breach justify the International in sanctioning the strike on April 28, 1948?

For the purpose of the determination of these motions, the facts are not in dispute except as to one issue [5] which need not be passed upon because of the decision herein. The parties have made full avail of the use of interrogatories, requests for admissions and pre-trial procedures. Reference will be made herein to such facts as are necessary to this decision. The attorneys for all parties concede that the motions raise questions of law that may now be passed upon.

### I. Was the Labor Relations Agreement in Effect on April 22, 1948?

The plaintiff Company contends that the decision in Boeing Airplane Company et al. v. National Labor Relations Board, D.C.Cir.1949, 174 F.2d 988, is res adjudicata of this issue as well as other issues in the case. Plaintiff concedes that our case does not involve the same cause of action but contends that the particular issue, namely the existence of the contract on April 22, 1948, was submitted to, was properly before and was judicially determined by the Court of Appeals in the above case. The Company contends that the International is also bound by the Court of Appeals decision on this issue of fact, since it was a party to and allegedly jointly liable [6] on the contract in question, contending that a person who controls a proceeding individually or in cooperation with others, is bound by the judgment as a party if he has an actual interest in the issue being determined.

The proceedings before the Board were those of an administrative agency charged with the enforcement of a statute. Title I, Sec. 101 of the Act, §§ 158, 160, Title 29 U.S.C.A. The action by the Company in the Court of Appeals was to review and set aside the cease and desist order of that administrative agency. A public in-terest was involved in each of those proceedings. On the other hand, in this action the plaintiff seeks to litigate its private rights and to recover for breach of contract under an entirely different section of the Act, namely Title III, Sec. 301, Sec. 185, Title 29 U.S.C.A.

In National Licorice Company v. National Labor Relations Board, 1940, 309 U.S. 350, at page 362, 60 S.Ct. 569, at page 576, 84 L.Ed. 799, the court said: "The proceeding authorized to be taken by the Board under the National Labor Relations Act is not for the adjudication of private rights (citing cases). It has few of the indicia of a private litigation and makes no requirement for the presence in it of any private party other than the employer charged with an unfair labor practice. The Board acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining * * *."

And at page 363 of 309 U.S., at page 577 of 60 S.Ct., "In a proceeding so narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights. Ordinarily where the rights involved in litigation arise upon a contract, courts refuse to adjudicate the rights of some of the parties to the contract if the others are not before it. * * * The rights asserted in the suit and those arising upon the contract are distinct and separate so that the Court may, in a proper case, proceed to judgment without joining other parties to the contract, shaping its decree in such manner as to preserve the rights of those not before it. * * *"

And at page 364, of 309 U.S., at page 577 of 60 S.Ct., it states: "Here the right asserted by the Board is not one arising upon or derived from the contracts between petitioner and its employees. The

---

5. Did the Company breach the labor relations agreement prior to the strike of April 22, 1948, by refusing to bargain, negotiate or arbitrate in good faith. The issue is discussed hereinafter.

6. As to joint liability see point II infra.

Board asserts a public right vested in it as a public body, charged in the public interest with the duty of preventing unfair labor practices."

The filing of the charge by Lodge 751 with the Board was merely the jurisdictional step giving the Board power to make its investigation and to file its complaint. Consumers Power Company v. National Labor Relations Board, 6 Cir., 1940, 113 F.2d 38, at page 42. The charge filed by the Board therefore merely set in motion the Board's machinery of inquiry and hearing; "the charge does not even serve the purpose of a pleading." National Labor Relations Board v. Indiana and Michigan Electric Co., 1943, 318 U.S. 9, 18, 63 S.Ct. 394, 399, 400, 87 L.Ed. 579.

Neither Lodge 751 or the International was a party to the proceeding before the Board. Neither was a party to the proceedings in the Court of Appeals. Filing of a brief as amicus curiae, as did the International on review of the order of the Board, did not make it a party to the action. Neither Lodge 751 or the International had any right to control the litigation or any part of it before the Court of Appeals, nor the right to appeal from the decision rendered in that case. No petition for certiorari was filed by the Board and neither Lodge 751 or the International had any right to petition for certiorari. They therefore had no power in any way to control or obtain a review of that decision or prevent it from becoming the law of that case.

It is apparent that the parties in the two proceedings are different. In the first case the Company was opposed by the National Labor Relations Board while in the suit before us the adverse litigants to the Company are Lodge 751 and the International. Further, not only are the parties not the same, but the fundamental nature of the action is entirely different. The hearing before the Board was an administrative procedure imbued with a public interest as contrasted with the present case which

is a private action to vindicate an alleged wrong arising ex contractu.

In Bulcke v. Graham, D.C.W.D.Wash. 1949, 91 F.Supp. 615, Judge Black distinguished between the effects of a prior action against a union under Sec. 303 of the Labor Management Relations Act, 29 U.S.C.A. § 187, to recover damages for unlawful picketing (Juneau Spruce Corp. v. International Longshoreman's etc., D.C., 83 F.Supp. 224) and an action growing out of the same facts and circumstances by Bulcke and Pearson representing the union, to enjoin Graham, the Regional Director of the Nineteenth Region of the National Labor Relations Board from seeking an injunction to restrain picketing by the same union, brought under Sec. 10 of the Act, 29 U.S.C.A. § 160.

The reverse of our situation is shown in New York State Labor Relations Board v. Holland Laundry, Inc., et al., 1945, 294 N.Y. 480, 63 N.E.2d 68, 75, 161 A.L.R. 802, in which the initial action was a private one and the second action was the one involving public interest. The court said (page 75 of the N.E. citation) "* * * A determination of the issues in an action between private parties cannot bar a contest to vindicate the public interest, as provided in the statute, just as a judgment in civil litigation between private parties does not bar a contest of the same issues by the State in a criminal action."

We hold that the decision of the Court of Appeals, setting aside the order of the Board is not res adjudicata of the issue of the existence of a contract on April 22, 1948, or any other issue in this case.[7]

We proceed to a consideration of the contract itself. The defendants attack that portion of Article XIII (supra) extending the duration of the contract and reading as follows: "This agreement shall be and remain in full force and effect from the 16th day of March 1946 to the 16th day of March 1947, and thereafter until a new agreement has been reached

---

7. Another issue affected by this ruling would be the question as to whether or not the strike of April 22, 1948 was in violation of the terms of the no-strike clause of the labor relations agreement and therefore wrongful.

by the parties either through negotiation or arbitration."

The defendants contend that this provision is so indefinite and uncertain as to duration as to be unenforceable and that there was therefore no contract in existence on April 22, 1948. They further contend that this clause constituted only a contract for a contract, which latter contract was never entered into and they contend finally that in any event the contract could only run for a reasonable period of time after March 16, 1947, and was terminable upon reasonable notice, in view of the language used. Certainly neither Lodge 751, the International or the Company were bound indefinitely by such a provision as to duration. But neither Lodge 751 or the International or the Company was without remedy.

Congress expressly considered and provided for the termination of a contract containing no expiration date. Sec. 8(d) of the Act, § 158, Title 29 U.S.C.A. provides in part: " * * * That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, *or in the event such contract contains no expiration date,* sixty days prior to the time it is proposed to make such termination or modification; * * *." (Emphasis added).

We are of the view that such a contract was terminable upon reasonable notice, after March 16, 1947 and that the provisions of the Labor Management Relations Act of 1947 afforded a remedy, and in substance provided that such a contract might be terminated by either party upon the sixty days notice provided for in the Act and upon compliance with the other provisions contained therein.

We agree with the conclusions reached in Boeing Airplane Company v. National Labor Relations Board, D.C.Cir., 174 F.2d 988, at page 991, " * * * that a contract of indeterminate duration may become terminable by unilateral action on the part of either party after a reasonable lapse of time. In enacting Section 8(d) (Section 158, Title 29 U.S.C.A.) Congress specified that the reasonable notice of termination would be, namely, sixty days. In this case the Company was allowed no more than twenty-four hours to consider a proposal containing demands which were far-reaching in their effect upon the Company. The Company did not accept the proposal and the strike occurred. This is not in compliance with the no-strike clause of the contract * * *."

We hold therefore that the labor relations agreement was in force and effect on April 22, 1948, unless it had been previously breached by the Company as discussed thereafter in point III.

II. The Interpretation of the Contract as to Joint or Several Liability on the Part of Lodge 751 and the International.

We have for consideration a novel contract in the field of industrial relations, in that it is signed by both Lodge 751 and the International, who are referred to together in the agreement as "The Union." The fact that both defendants were grouped in such a term in the contract cannot in itself be determinative of the issue, but the interpretation to be placed on the contract is the intention of the parties as drawn from the entire agreement, the circumstances of the parties and their relative positions at the time of the execution of the agreement, and their conduct.

Professor Williston in Vol. 3 of his work on Contracts, revised edition (1946) Sec. 607, pg. 1740 says: "According to the weight of authority, and on principle, where the parties have assented to a writing as an expression of their agreement, or where a writing is required by law, the standard of interpretation is the standard of limited usage, that is, the ordinary meaning of the writing to parties

of the kind who contracted at the time and place where the contract was made, and with such circumstances as surrounded its making * * *"

And at Sec. 609: "Though the expressions in the cases are numerous that where language used in a contract is clear and unambiguous, there is no opportunity for interpretation or construction, yet these expressions themselves need interpretation. As has been seen, in a strict sense, every contract needs interpretation, and, therefore, the expressions in question are literally inexact, moreover if the local standard is adopted, contracts apparently clear in their meaning may be shown by usage or the surrounding circumstances to be ambiguous or perhaps clearly to mean something different from the normal or ordinary meaning of their language * * *"

And at Sec. 623: "The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court and to this end not only the act but the declarations of the parties may be considered * * *"

In re John B. Rose Co., 2 Cir., 1921, 275 F. 409, 414–415, was a case involving two insurance policies where the assureds were two different companies and in construing the contract the court said: "It is possible in the same contract that some promises shall be joint and others by the same promisors shall be several. Williston on Contracts, vol. 1, § 325. And see Buster v. Fletcher, 22 Idaho 172, 125 P. 226; Gibbons v. Bente, 51 Minn. 499, 53 N.W. 756, 22 L.R.A. 80; Krbel v. Krbel, 84 Neb.

160, 120 N.W. 935. It is possible that the John B. Rose Company and the Rose Brick Company might make themselves jointly liable for premiums on policies insuring their joint employees if they should have any, while each might assume a several liability for premiums on policies insuring simply its own employees. The question whether this was what the parties did in the contract now under consideration is to be determined by the language used and by intention of the parties as gathered from all the circumstances of the case."

In Shively v. Globe Manufacturing Co., 1928, 205 Iowa 1233, 219 N.W. 266, 268, the court said: "We must construe this contract in the light of all the circumstances surrounding the parties at the time, and also in view of their purpose and intention, and also the practical construction of the same by the parties."

The determination as to whether the obligations of Lodge 751 and the International were joint, as contended by the Company, or were several as contended by the defendants, is a material one, since if the contract imposed joint obligations on Lodge 751 and the International, then the calling of the strike by Lodge 751 was also the act of the International and both defendants would be jointly liable for breach of contract. Williston, Contracts, Vol. 2, pp. 928–929, Sec. 316. Restatement, Contracts, Vol. 1, p. 134, Sec. 117. American Jurisprudence, Vol. 12, pp. 816–817, Sec. 270.

On the other hand, if the obligations of the defendants are several, then the act of Lodge 751 in calling the strike [8] would not

8. Sec. (45) of the stipulation between the parties sets forth the facts concerning the calling of the strike: "(45) On or about April 20, 1948, 350 shift committeemen and District Council delegates of Lodge 751, representing employees of respondent Boeing, at a meeting called for the purpose, directed their negotiating committee and officers to present their final demands to the respondent Boeing and voted to authorize the officers to call the strike if their demands were not met."

The Company, in its "Further Interrogatories" dated April 18, 1950, to Lodge 751 and identical interrogatories to the International, inquired in No. 3 as follows: "13. State whether representatives of the International C. L. Bentley and Gary Cotton attended the meeting * * * referred to in paragraph 45 of said stipulation * * *."

To this interrogatory defendants made joint answer as follows: "Gary Cotton attended said meeting; C. L. Bentley did not."

On April 21, 1948, H. W. Brown, President of the International, sent the following telegram to Harold J. Gibson, President of Lodge 751: "I direct you to instruct members employed by the Boeing Aircraft Company to remain at

in itself be the act of the International or impose liability upon the International.

Article IV of the agreement concerned conditions of employment; Article V, safety; Article VI, vacations; Article VII, seniority; Article VIII, leaves of absence; Article IX, hours of labor; Article X, wages. These agreements were the several obligations of Lodge 751 alone and not obligations of the International.

In various places in the contract the word "Union" is used, where it must be held that the legal effect thereof was a reference only to Lodge 751. For instance, in Article II, Sec. A, 1, appears "The Union represents that it has the jurisdiction and the authority to negotiate and enter into this agreement in behalf of the employees * * *" In subsection 2 of the same Article and section appears "The Company recognized the Union * * * as the sole collective bargaining agency * * *" Article III, Sec. B, provides for non-discrimination for union activities. Obviously the use of the word "Union" in these provisions means Lodge 751, and the obligations created are the several obligations of Lodge 751.

In Article III, Sec. D, 1, appears "The Union will keep the Employment Office advised at all times of each available member of the Union and the Company agrees to give such members of the Union preference of employment * * *" And further, in the same Article and Section, the Company agreed to notify the Union

daily of its "estimated employment requirements" and of "all newly hired, reemployed and terminated employees" and to furnish each week a list of transferred employees.

Obviously, it was not the intention of the parties that this section applied to the International. Unemployed members of the International available for work in Florida and Maine were of no concern to the Company. Article XII, Sec. A, 2, concerning grievances makes reference to the "President of the Union" and provides that the President of the Union shall meet with the Director of Industrial Relations of the Company concerning certain grievances. Obviously, this reference is to the President of Lodge 751 and not the President of the International.

Plaintiffs rely on the presumption of joint liability unless words of severance are used, and rely on 17 Corpus Juris Secundum, Contracts, § 254, page 811: "Promises of several persons are, in the absence of statute, presumed to be joint and not several, nor joint and several, unless a contrary intention is shown in the instrument, * * *", and cases cited thereunder.

The great number of several obligations, binding only Lodge 751, takes this case out of the category where the presumption might apply.

No labor cases are cited by the plaintiff in support of its view and most of those that are cited concern obligations to pay money. Others concern the application of

work until this office advises that government intervention in dispute of Local No. 751 and Boeing Aircraft Company has failed."

The transcript of the hearing on motion for summary judgment on May 25, 1950, page 60, reads as follows:

"The Court: Is it the view of counsel on both sides that because of the extensive requests for admissions, requests for interrogatories, the pretrial hearing that we had, and so forth, there is no factual dispute in this case?

"Mr. Perkins: (Attorney for plaintiff) On the matter of liability?

"The Court: Liability.

"Mr. Perkins: I know of no substantial dispute on the facts, your Honor."

Further, at page 61:

"Mr. Perkins: I will make this statement, then, to your Honor: As far as this record is concerned at the present time there is nothing in the record to indicate that sanction of the International occurred prior to April 28th in the sense of official action intra-organizationally speaking, as far as the International is concerned. Is that what your Honor is getting at?

"The Court: Yes, that is what I mean. And you desire to reserve, certainly, your legal contention that there was a joint liability between the Lodge and the International, relying upon various undisputed facts, as well as the law, for that contention.

"Mr. Perkins: That is correct."

partnership law and law relating to principals and agents.

Lodge 751 was the sole collective bargaining agency in dealings with the Company and had been so certified and recognized since about June 17, 1937, long before the execution of the contract in 1944. It was the only entity or agency with whom the Company could legally carry on collective bargaining activities. Therefore the International, in becoming a party to the agreement, did not become so in any direct or joint relation as to the matters of hours, wages and conditions of employment, which are the primary concerns of the labor relations agreement.

What then was the function and place of the International in this agreement? From a reading of the entire agreement it seems clear that Lodge 751 was the principal obligor with several obligations and that the International stood in a secondary position with certain several obligations backing up the Lodge, as it were, in attempting to insure that the contract provisions were carried out by the Lodge. The preamble to the agreement states that the Union "shall enforce and carry out all the provisions of this agreement." The words "carry out" would pertain to Lodge 751. The word "enforce" clearly typifies the position of the International and its obligation to use its good offices to see that the contract was carried out.

Article XI, Section A, 1, contained the no-strike clause and provided that "during the life of this agreement no strike shall be caused or sanctioned by the Union * * *" It is apparent that the word "caused" was used advisedly, since it is a word of broader meaning than the word "called." Certainly, the clause meant that Lodge 751 should not cause a strike, and it also meant that the International should not cause one. This obligation of the International was a several one. No liability for the calling of the strike was incurred by the International because the evidence is without dispute that Lodge 751 was the actor and plaintiff's theory is one of joint liability—liability of the International for the acts of Lodge 751. The amended complaint in paragraph VI alleges "* * *

on April 22, 1948, a strike * * * was caused and sanctioned by defendants and each of them * * *" There is no allegation relying on the sanctioning of the strike by the International on April 28, 1948.

The word "sanction" clearly pertains to the International. In ordinary use it means "to ratify, to confirm or approve" or "anything done to enforce the will, law, or authority of another." Lodge 751 could not "sanction" a strike which it had called.

The other provision contained in Article XI, Section A, 1, reading: "Any action of the employees in refusing to go through a picket line in case of an officially declared strike by some union directly working on the job, if said strike is *sanctioned* by Aeronautical Industrial District Lodge No. 751 of the International Association of Machinists, shall not constitute a violation of this clause of the agreement," obviously is a use of the word "sanction" pertaining to Lodge 751 and concerns the sanction by Lodge 751 of a strike by some union other than the defendants to this action. There is no conflict between the use of the word "sanction" twice in the same clause, since the word is used with the same meaning in each instance, namely the approving of the strike of another union.

The constitution of the International contained provision for "sanctioning" of strikes and it is apparent that the Company knew of this provision, at least on April 22, 1948, the day of the strike, when in its first communication to the International, after the strike, it inquired as to whether the International had *"sanctioned"* the strike.

Thus the contract itself calls for the interpretation that obligations of the defendant thereunder were several and not joint.

A difference exists between the ordinary commercial contract and a labor relations agreement because of the public interest in the latter. There is a definite public interest in achieving and maintaining industrial peace and Congress has determined that collective bargaining and written agreements between labor and management is conducive to such peace.

The interpretation of labor relations agreements therefore should be made in the atmosphere of the general public policy in favor of the validity of such agreements, and of the beneficial results which can flow from the honest and faithful performance of the undertakings agreed upon by labor and management.

Under the facts of this case there is a public policy factor in favor of a construction that the obligation of the International is several and not joint. We reason it as follows: Beneficial social results can follow from the participation of parent organizations such as the International in labor relations agreements entered into by local unions. The power and authority of the International may be sufficient to maintain the industrial peace (though admittedly such a result did not follow in this case). If labor relation agreements are construed so as to impose liability upon the parent organization for the acts of the local affiliate on the theory of joint liability and not based on its own acts, then the Internationals will refuse to become a party to such agreements with the resultant loss to sound labor relations and the public welfare.

The parties by their conduct have placed the same interpretation upon the obligations of Lodge 751 and the International as this court has placed upon them. An exchange of wires between the Company and the International occurred immediately following the strike. On April 22, the day of the strike, William M. Allen, President of Boeing Airplane Company wired Harvey W. Brown, President of the International, as follows: "At 12:30 AM today Local 751 of the International Association of Machinists caused its members to strike at the Boeing Airplane Company's plant in Seattle. Our operations are picketed today. Please advise by return wire if this action was sanctioned by the International Association of Machinists."

Note that the wire does not accuse the International of having caused the strike or of being jointly liable for the strike. Note also that it inquires whether or not the International had sanctioned the strike. On April 23, Brown, President of the International wired Allen, President of Boeing Airplane Company as follows: "International Association of Machinists executive council did not sanction strike at Boeing Airplane Company's plant at Seattle. Your April 22 telegram received after office hours."

Then follows a wire in which Allen invites suggestions from the International; the International's reply suggesting a subcommittee from the General Executive Council come to Seattle and discuss the entire matter with Allen; wire by Allen stating he would be pleased to meet with such a sub-committee; wire by Brown advising sub-committee will arrive in Seattle late Tuesday morning.[9]

9. The full text of the first two wires are quoted above—the additional wires read as follows:
"Harvey W. Brown, President
"International Association of Machinists
"Washington, D. C.
"Appreciate your wire stating you did not sanction strike. I wish to point out that no notices were given by Local 751 which would constitute compliance with section 8d of the National Labor Relations Act: that individuals represented by local 751 are engaging in a strike in violation of this section: That these individuals have therefore lost their status as employees of this company: and as a consequence, local 751 does not at the present time constitute a collective bargaining agent under the National Labor Relations Act. I feel you should have this information and I invite any suggestions you may have in light of this situation.
                "Boeing Airplane Company
                        William M. Allen"
"4-23-48

                "Washington, D. C.
                "April 24, 1948
"Mr. William M. Allen
"Boeing Airplane Company
"Seattle, Washington
"Reurtel April 23rd. Responding to your invitation I suggest a subcommittee from our General Executive Council come to Seattle and discuss this entire matter with you. Please advise.
                "H. W. Brown
"B/bf
"9:25 A.M."

█ We hold that the agreement imposes several and not joint obligations on the defendants.

III. Did the Company Breach the Labor Relations Agreement Prior to April 22, 1948, by Failing to Bargain, Negotiate or Arbitrate in Good Faith with the Defendants as Alleged by Them; If So, did this Constitute a Material Breach of the Agreement?

█ The second affirmative defense of Lodge 751 alleges that the "agreement had been materially violated by plaintiff prior to said date (April 22, 1948) and by reason of said violation by plaintiff, plaintiff * * * has waived any claim for damages and has given justification and implied presumption or license to this defendant to cause or sanction a work stoppage."

The third affirmative defense of International alleges that "prior to the 22nd day of April 1948, plaintiff materially breached the said Labor Relations Agreement set forth in plaintiff's amended complaint." At the pretrial it appeared that the basis for this alleged breach was the alleged failure of the Company, prior to April 22, 1948, to negotiate, bargain or arbitrate in good faith concerning a new contract.

Title I, Sec. 101 of the Labor Management Relations Act of 1947, Sec. 158(d), Title 29 U.S.C.A. states: "(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and *confer in good faith* with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement * * *." (Emphasis added.)

Article XIII, Sec. A, of the contract under consideration provided that it was to remain in full force and effect "until a new agreement has been reached by the parties either through negotiation or arbitration." The only provision in the contract providing for the setting up of arbitration proceedings appears in Article XIII, "Determination of disputes." Sec. B thereof is entitled "Arbitration proceedings and selection of arbiters." It is apparent that the parties intended that arbitration would be resorted to if negotiations for a new contract failed and intended that Sec. B set out the procedure by which arbiters would be selected and arbitration carried on.

A failure by either party to such an agreement to bargain, negotiate or to arbitrate in good faith would be clearly a material breach of the contract. Particularly is this true under the facts of this case where the contract term expired on March 16, 1947 and where the old contract was to continue until the new one was arrived at by negotiations or arbitration.

It is apparent however, that a determination of this issue requires a complete examination of the course of dealings, negotiations and conduct of the parties over a period of thirteen months from March 16, 1947 until April 22, 1948. This therefore is a question of fact to be determined upon a trial and cannot be reached upon the motions for summary judgment.

IV. Assuming That There was No Breach of the Agreement Prior to April 22, 1948, by the Company, was the Work Stoppage a Breach of the No-Strike Clause and was the Breach a Material One?

█ The no-strike clause is the very heart of a labor relations agreement. The

"Harvey W. Brown, President
"International Assn. of Machinists
"Washington, D. C.
"In reply to the suggestion contained in your telegram of April 24, we will be pleased to meet with a subcommittee of your general executive council.
　　　　"Boeing Airplane Company
　　　　　　William M. Allen"
"4-24-48

"Mr. William M. Allen
"Boeing Airplane Company
　　　　　　　　Washington, D. C.
　　　　　　　　April 26, 1948
"Reurtel April 24. Subcommittee arriving Seattle late Tuesday morning. They will contact you about 1:00 P.M.
"B/as　　　　H. W. Brown, President
"2:30 P.M.　　　International Assn. of
　　　　　　　　　Machinists."

primary purpose of the agreement is to prevent strikes and lockouts and to insure peaceful industrial relations. In National Labor Relations Board v. Columbian Enameling & Stamping Co., Inc., 7 Cir., 96 F.2d 948, 953 affirmed 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660, the court said 96 F.2d at 953: "No foundation more secure and reassuring or more protective of the rights of both labor and capital can be found than that *reasonable contracts, not violative of public policy, should be respected by the parties who pledged their words and their integrity to abide by their terms.* We grope only in darkness and trek further into the wilderness of confusion and lost landmarks if we lose sight of this beacon light. Progress lies only in respect for one's agreement. Respect for and support of the cause of labor follows labor's respect for its contract. The same Bill of Rights which through one section gives just protection to labor, through another section protects the just rights of others. Overruling one will result in the overthrow of the entire Bill of Rights." (Emphasis added.)

The defendants contend that Article XI containing the no-strike clause and Article XII containing the arbitration provisions must be read together, and that as so read they mean in substance, that there shall be no strike upon matters which are subject to arbitration. The defendants point out that Article XII Sec. A, 2(c) provides "that neither the parties nor the Arbiter shall have the authority to alter this Agreement in whole or in part" and that Article XI A(2) provides "The Union specifically directs its members * * * not to engage in strikes * * * or any other form of work stoppage unauthorized by the Union." These sections they conclude, read together, mean that there is an agreement not to strike on any matter which is subject to arbitration but that since a new agreement would constitute a changing or alteration of the old agreement this is not subject to arbitration and that the agreement impliedly authorizes the Union to strike.

The argument is an ingenious one, but this was not the intent of the parties. We find that it was the intent of the parties that the old agreement was to continue until a new agreement was entered into as the result of negotiation or arbitration, and we find further that the parties intended that arbitration would be resorted to if negotiations failed and that the arbitration machinery set up in the agreement would apply to arbitration of a new contract.

Furthermore, Sec. 101, Title I, of the Labor Management Relations Act, § 158 (d), Title 29 U.S.C.A., expressly sets forth the procedure to be followed in the event the Union finds it necessary to engage in a strike, where there is in existence a collective bargaining contract affecting employees engaged in interstate commerce.

We hold (assuming there was no breach of the contract by the Company prior to April 22, 1948), that the work stoppage occurring on that day as a result of the acts of Lodge 751 was a material breach of the contract.

## V. The Legal Effect of the Company's Letter of April 22, 1948.

The parties have executed a written stipulation that the interpretation and the effect of the Company's letter of April 22, 1948, is a question of law which may be passed upon as part of the motions under consideration. Defendants claim that the letter constituted a rescission; the plaintiff claims that it constituted an election to end the contract only for all purposes of performance and entitled it to sue for profits that would have been realized but for the strike.

In interpreting the letter the court must consider the document as a whole, the words used, the circumstances surrounding the writing of the letter, the relative position and circumstances of the parties, and then ascertain the intent of the Company therefrom.

After the strike the Company need not have written any letter, nor given any notice, if it desired to pursue any of the alternatives available to it other than rescission. Having chosen to write the letter, it should have made its position clear and

610

any ambiguities in the letter must be interpreted against the Company.

The plaintiff relies on the following law as stated in 17 C.J.S., Contracts, § 472: *"Election of remedies.* Where there has been a *renunciation* of an executory contract by one party, the other party has a right to pursue one of three remedies: (1) To rescind the contract and pursue the remedies based on such a rescission, as is explained in § 429 supra. (2) To treat the contract as still binding and wait until the time arrives for its performance, and at such time to bring an action on the contract for breach, as is observed in § 472b (3) infra. (3) To treat the *renunciation* as an immediate breach and sue at once for any damages which he may have sustained." (Emphasis added.)

And as stated in 6 R.C.L., § 389, p. 1032: "It is well settled that, where one party *repudiates* the contract and refuses longer to be bound by it, the injured party has an election to pursue one of three remedies: (1) He may treat the contract as rescinded, and recover upon quantum meruit so far as he has performed; or (2) he may keep the contract alive for the benefit of both parties, being at all times himself ready and able to perform, and at the end of the time specified in the contract for performance, sue and recover under the contract; or (3) he may treat the *repudiation* as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing * * *" (Emphasis added.)

One of the leading cases cited throughout various jurisdictions of the country, Lake Shore and M. S. Ry. Co. v. Richards, 1894, 152 Ill. 59, 38 N.E. 773, 30 L.R.A. 33, is to the same effect and spells out the three alternatives set forth above.

(a) *The remedy plaintiff seeks to pursue is only available in cases of abandonment, renunciation or total breach of a contract. It is not available here.*

■■■ In viewing the legal problem presented it must be kept in mind that the contract contained a clause in Article XI A, 2, providing " * * * in the event

that strikes * * * or any other form of work stoppage occurs, the parties agree to take corrective action with a view toward preventing a recurrence of such incident." The parties thus contemplated and intended that the contract would have life even in the event of a strike. They did not intend that a strike, ipso facto, would terminate the contract.

Contracts may by their terms continue even after breach. It is in this setting that the Company's letter of April 22, 1948 must be considered. The cases cited by plaintiff are all situations where there was a repudiation, abandonment or total breach of the contract. In Anvil Mining Company v. Humble, 1894, 153 U.S. 540, 14 S. Ct. 876, 38 L.Ed. 814, the mining company prevented plaintiffs from further performance of their contract. In Roehm v. Horst, 1900, 178 U.S. 1, 20 S.Ct. 780, 783, 44 L.Ed. 953, the breach complained of as to three contracts, was defendant's written notification that it refused to accept the shipments, and as to these, the Supreme Court applied the doctrine of anticipatory breach. The fourth contract sued on was broken during the course of performance and as to it the Supreme Court said " * * * a contract may be broken by the renunciation of liability under it in the course of performance * * *." In Lovell v. St. Louis Mutual Life Insurance Co., 1884, 111 U.S. 264, 4 S.Ct. 390, 28 L.Ed. 423, the defendant Life Insurance Company closed out its business and transferred its assets and policies to another Company. The Court held that this was a total abandonment of the contract. In Pierce v. Tennessee Coal, Iron & R. Co., 1899, 173 U.S. 1, 16, 19 S.Ct. 335, 341, 43 L. Ed. 591, the plaintiff was discharged from employment by the defendant. The Supreme Court termed this an "absolute breach" and held that the plaintiff "had the right to elect to treat the contract as absolutely and finally broken by the defendant." In the Lake Shore case, supra, the leading case on the remedy sought by plaintiff, the trial court termed the defendant's acts a "repudiation of the contract" [152 Ill. 59, 38 N.E. 777] and the Supreme Court of Illinois stated 38 N.E. at page 777,

"it is well settled that *where one party repudiates the contract,* and refuses longer to be bound by it, the injured party has an election to pursue either of three remedies" and then spelled out the three alternatives. (Emphasis added.)

The same principle of abandonment, repudiation or total breach runs through the other cases cited by plaintiff. We turn now to the Washington cases. In Dyer v. Middle Kittitas Irrigation Dist., 1901, 25 Wash. 80, 64 P. 1009 the defendant's financial situation became precarious with the result that the construction bonds could not be sold. The court held that the contractors "had the unquestioned right to abandon the contract and to sue for and recover compensation for damages." It is apparent that the court treated the breach as a total one. In Town of Castle Rock v. Furth, 1914, 78 Wash. 47, 138 P. 317, 318 the contractors failed to carry out their contract to construct an electric light system and the city council passed an ordinance declaring their rights forfeited and gave notice thereof. The Washington Supreme Court said, "In other words, they (the Contractors) had abandoned all their rights and repudiated all their obligations thereunder. Clearly the town had the right to treat the franchise contract as abandoned * * *." In Campbell v. Hauser Lumber Co., 1928, 147 Wash. 140, 265 P. 468, 470, the Supreme Court said, "The authorities generally hold, and it is the just rule, we think, that if the breach be of a substantial part of an entire contract, as distinguished from a part that is immaterial or inconsequential * * * an abandonment of the whole is justified." In Boyer v. City of Yakima, 1930, 156 Wash. 518, 287 P. 211, 213 the city took over the premises where a reservoir was being constructed and prevented the plaintiff from completing the work. The court said, "The law touching the rights of a party to a contract *injured as appellants are alleged to have been injured,* is well stated in the leading case of Lake Shore & M. S. Ry. Co. v. Richards, 152 Ill. 59, 38 N.E. 773, 777, 30 L.R.A. 33, as follows: 'it is well settled that where one party repudiates the contract * * * *'"

and then quotes the Lake Shore case as to the three remedies. (Emphasis added.)

We distinguish between a material breach of the labor relations agreement and a repudiation or abandonment thereof. Certainly the strike, in violation of the no-strike clause in the agreement and without compliance with the provisions of the Labor Management Relations Act of 1947 was, (in the absence of prior breach by the Company), a breach of the agreement and a material one. But in view of the terms of the contract, did it consist of a complete repudiation?

The Company " * * * was at liberty to treat them (the strikers) as having severed their relations with the company because of their breach and to consummate their separation from the company's employ by hiring others to take their places." National Labor Relations Board v. Sands, 1939, 306 U.S. 332, 344, 59 S.Ct. 508, 514 83 L.Ed. 682.

■ But there still remained life to the agreement. The parties had agreed in just such an event "to take corrective action with a view toward preventing a recurrence of such incident." We hold that the strike was a material breach of the agreement (in the absence of prior breach by the Company) but that it was not a complete repudiation or renunciation of the agreement. We conclude that in the absence of such a complete renunciation or abandonment of the agreement the remedy relied on by the plaintiff was not available.

(b) *The plaintiff has elected to rescind.*

■ (1) Passing the question of the availability to the plantiff of the course it attempts to rely upon, there were open to the plaintiff alternative paths to follow. Which of these did it select? Defendants urge that plaintiff's choice was not one between inconsistent remedies but one between substantive rights and urge further that only an overt act or a notice of the election was necessary. The plaintiffs contend that no final election occurred until the filing of plaintiff's action on May 5, 1948, for damages for breach of contract.

"The duty to make compensation in unliquidated damages that rests upon a party to a bilateral contract not yet fully performed on either side, who has committed such a breach thereof as to discharge the other party is itself discharged by the manifested assent of the injured party to terminate all duties under the contract * * *" . Restatement of Contracts, Sec. 410.

In Mackey v. Lathrop Co., 1917, 91 Conn. 348, 99 A. 691, the court held that no action could be maintained on a contract saying: "We think that the evidence supports the finding by showing acts, conduct, and declarations of the plaintiff clearly evidencing an intention on his part not to be bound by the contract, thus warranting the rescission of the contract * * *."

In a variety of contract situations the Washington Supreme Court has followed this rule and held an election effective when made. In Houser & Haines Mfg Co., v. McKay, 1909, 53 Wash. 337, 339, 101 P. 894, 27 L.R.A.,N.S., 925, a purchaser of personal property who rescinded could not recover both the consideration paid and damages. In Holt Mfg Co., v. Strachan, 1914, 77 Wash. 380, 137 P. 1006, the election of the vendee of personal property to rescind was conclusive and he could not recover damages. In Blenz v. Fogle, 1923, 127 Wash. 224, 231, 220 P. 790, and in Chavelle v. Duclos, 1929, 154 Wash. 492, 495, 282 P. 843, the vendor of real property, after breach, forfeiture and repossession of the property, could not sue for moneys due under the contract of sale. In Dishman v. Huetter, 1906, 41 Wash. 626, 84 P. 590; upon breach of contract by lessors, and rescission by lessee, lessors could not recover on the contract.

In Batcheller, Inc., v. Welden Construction Co., 1941, 9 Wash.2d 392, 403, 115 P.2d 696, 701, the court says: "The doctrine of election of remedies is applicable only where there are available to the litigant at the time of the election, two or more coexistent remedies, which are repugnant and inconsistent. This rule is upon the theory that, of several inconsistent remedies, the pursuit of one necessarily involves or implies the negation of the other. The rule does not apply where the remedies are cumulative merely. 18 Am.Jur. 134, § 11" "Two modes of redress are inconsistent if the assertion of one involves the negation or repudiation of the other, as where one of them admits a state of facts and the other denies the same facts, or where one is founded upon affirmance and the other upon disaffirmance of a voidable transaction. 18 Am.Jur. 135, § 12."

In Skoug v. Hartford Accident and Indemnity Co., 1923, 124 Wash. 293, 214 P. 155; Jordan v. Peek, 1918, 103 Wash. 94, 173 P. 726; and Jones v. Reynolds, 1907, 45 Wash. 371, 88 P. 577, vendors under conditional sales contracts, in choosing between the right to retake the property or receive the balance of the purchase price make a final election. In Kimble Motor Car Co. v. Androw, 1923, 125 Wash. 225, 215 P. 340; and Weber Showcase & Fixture Co., v. Waugh, D.C.Wash.1930, 42 F.2d 515, filing a claim against an estate is a binding election which precludes the vendor in a conditional sales contract from retaking the property.

1 A.L.R.2d 1084, contains an excellent annotation entitled "Notice of Rescission is irrevocable election when other party refuses to assent thereto." At page 1085 appears: "* * * In legal theory a rescission, as the word signifies, is a cutting back or severance of the contract relationship. *A party entitled to avoid a transaction does so by giving notice to the other party of his decision to do so. By this notice the contract is abrogated * * .* * Naturally the consent of the other party, and his return of the consideration, has never been deemed a prerequisite to the effectiveness of the annulment.

"It follows as matter of course that if a party has thus wiped out a transaction he cannot sue upon it or in affirmation of it, as he does if he seeks to recover damages for breach of some warranty in it, or for some fraud in its inception. To this simple metaphysic of the law is added the reasonable ethic that the other party is entitled to know, once for all, where he stands.

"This principle has been declared in so many cases, and in so many ways, that quotations are hardly necessary. The following are good examples: 'A man may not take two contradictory positions, and where he has a right to choose one of the two modes of redress, and the two are so inconsistent that the assertion of one involves the negation or repudiation of the other, his deliberate and settled choice of one, with knowledge, or means of knowledge, of such facts as would authorize a resort to each, will preclude him thereafter from going back and electing again.' Kearney Mill. & Elevator Co. v. Union P. R. Co., (1896), 97 Iowa 719, 66 N.W. 1059, 59 Am.St.Rep. 434; Thompson v. Howard, (1875), 31 Mich. 309. 'If the facts exist which justify a rescission by one party, and he exercises his right and declares a rescission in some effectual manner, he terminates the contract, and it cannot thereafter be made the basis of an action for damages caused by a breach of its covenants.' Lemle v. Barry, (1919), 181 Cal. 1, 183 P. 150; House v. Piercy, (1919), 181 Cal. 247, 183 P. 807.

" 'Election is simply what the term imports—a choice shown by an overt act between two or more inconsistent rights, either of which may be asserted at the will of the chooser alone.' 18 Am.Jur. 129, Election of Remedies, § 3. 'Often, what is spoken of in judicial opinions as a choice between remedies is in reality a choice of alternative substantive rights. The distinction is one not infrequently obscured, and yet it is important that it is heeded * * * The doctrine of election of remedies applies in order to protect one from vexatious litigation, while *the rule as to election of substantive rights has to do with the actual status of some property or contractual rights. That is to say, a person having the option to fix definitely a property or contractual right without reference to the consent or wishes of the other party to the transaction is bound by his exercise* of the option.' * * *" (Emphasis added.)

To the same effect, as to an election between substantive legal relations, Restatement on Contracts, Sec. 381, comment (d).

The following cases hold that a definite rescission by the injured party, even if manifested by notice only, constitutes a binding election which prevents a later suit in affirmation of the contract: Presbrey v. Kline, 1892, 9 MacKay 513; Lassen v. Mitchell, 1866, 41 Ill. 101; Stewart v. Salisbury Realty & Ins. Co., 1912, 159 N. C. 230, 74 S.E. 736; Roney v. H. S. Halvorsen Co., 1914, 29 N.D. 13, 149 N.W. 688; Monds v. Birchell, 1908, 59 Misc. 287, 112 N.Y.S. 249; Whalen v. Stuart, 1909, 194 N.Y. 495, 87 N.E. 819; Stowell Motor Car Co. v. Hull, 1921, 117 Misc. 789, 191 N.Y.S. 570.

We hold that the letter of April 22, 1948, manifested the intention of the plaintiff to rescind and was the acceptance by it of the choice between contract and no contract, a choice between substantive right or no right. The letter therefore constituted a final election to rescind.

(2) But assuming that notice alone as shown by the letter, is not sufficient to constitute a binding election before the filing of this action on May 5, 1948, we find also reliance by the defendants on that notice sufficient to make the election binding.

We find reliance and change of position on the part of the International. The Company's letter of April 22, said that the contract was terminated and at an end. Though addressed to the Lodge it did not limit its application merely to the Lodge. After the letter was written and prior to the filing of suit, the International attempted to negotiate with the Company and the Company refused to participate in meetings for that purpose. If there was doubt as to whether the Company intended to terminate its contractual relations with the International when the letter was sent, this doubt was resolved prior to the filing of suit when the Company refused to meet with officers of the International. The sanctioning of the strike thereafter by the International on April 28th was a change of position and a reliance upon the letter of April 22, 1948 and the Company's election to rescind.

The court also finds reliance and change of position on the part of the Lodge as follows: The Lodge was on strike and the strike was continuing from day to day. The purpose of a strike is to bring economic pressure on the employer and to obtain the stated demands of the strikers. It is not contemplated the strike will continue indefinitely. The Company, having sent the letter or a notice, should have clearly stated its position and the Lodge was entitled to rely on the letter from day to day as the strike continued. Had the Company made clear in its letter of April 22, 1948 that which it now contends, namely that it was in substance giving notice that it would sue for damages, this notice might have well caused Lodge 751 to reconsider its position and to have called an end to the strike. Lodge 751 could have reasonably assumed that the letter meant rescission and that since the Company was rescinding for breach of the no-strike clause, and was not suing for damages, this could well have been a factor in the Lodge's determination to continue the strike from day to day. We find the continuance of the strike from day to day after April 22, 1948, a reliance by Lodge 751.

(c) *The Supreme Court of the State of Washington has passed upon the words "terminated and at an end."*

▇▇ The words "terminated and at an end" would not necessarily be a conclusive solution of our problem, since the cases have applied various meanings to such words as "terminate" and "rescind."

Under the well known rule of the Supreme Court of the United States established in the case of Erie Railroad Co. v. Tompkins, 1937, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, a decision by the Supreme Court of the State of Washington upon a question of substantive law is binding upon this Court and determinative of any issue so decided. The Supreme Court of Washington has had before it a notice stating that an agreement was "terminated and at an end." In the case of Beltinck v. Tacoma Theater Co., 1910, 61 Wash. 132, 111 P. 1045, there was involved an action to recover damages for breach of a written contract. One of the defenses was that the defendant had effectively rescinded the contract because of a prior breach by plaintiff, and thus the question of rescission and the sufficiency of the notice thereof was squarely before the court. The notice contained the following language: " 'You are hereby notified that because of your failure to keep and perform the terms, covenants and conditions * * * in that certain agreement * * * *the said undersigned does declare. said agreement terminated and at an end.* You are requested to forthwith remove your advertising drop curtain from the premises of the undersigned, to wit, the Tacoma Theater, in the city of Tacoma, Washington, and forthwith pay to the undersigned all amounts now due from you to the undersigned to this date. You are further notified that unless you at once signify your intention to remove said curtain and do forthwith remove the same, that the undersigned will remove the same and hold the same subject to your order.' " (Emphasis added.)

The Washington Court throughout its opinion referred definitely to the rescission by defendant, and in affirming the judgment for defendant concluded its opinion in the following language: "Appellant had failed to pay in accordance with the terms of his contract, although frequent demands were made upon him. Respondents were not compelled to refuse defaulted payments in order that they might preserve their right to *rescind* the contract for appellant's breach. They accepted such payments, for which appellants received credit, but they protested against appellant's course of dealing and repeatedly threatened to remove the curtain. Appellant thereafter remained in default; whereupon they *rescinded.* This is not an instance where a *rescission* was declared without previous demand or warning. If respondents, after repeated demands and warnings, could not *rescind,* they would have been compelled to continue the curtain indefinitely, although appellant constantly remained in default. The contract imposed no such obligation." (Emphasis added.)

We hold that the Company's letter of April 22, 1948, constituted a rescission of the contract.

## VI. In Any Event there is no Liability on the Part of the International.

 If the court's interpretation is wrong and the letter did not constitute a rescission, there would still be no liability in respect to the International.

We have heretofore referred to the fact that Lodge 751 and not the International called the strike. The obligations of the defendants were several and not joint and therefore no liability for the strike attached to the International.

Assuming the letter of the Company was not effective as a rescission, the Company had a continuing duty to negotiate with the International which is found in that sphere of the contract pertaining to the obligations of the International, i. e. "enforcing" the contract and of taking "corrective action" as provided in the contract.

The Company refused to negotiate with the representatives of the International.[10] This was a material breach of the contract between the Company and the International. The real function of the International as a party to the agreement was to have its assistance in a crisis such as the one presented by the strike.

If there was no rescission, the sanctioning of the strike by the International on April 28th was justified by the prior material breach by the Company in refusing to negotiate with the International.

The order of the court will be as follows: (1) The motion of Lodge 751 to dismiss is denied; (2) The motion of the International to dismiss is denied; (3) The motion of plaintiff for a partial summary judgment is denied; (4) The motion by Lodge 751 for summary judgment is granted; (5) The motion by International for summary judgment is granted.

The defendants will prepare suitable order within the time provided by the rules of this court.

---

10. The stipulated facts appear in paragraph 52.

"(52) On or about Tuesday, April 27, 1948, the officers and representatives of Lodge 751 agreed to attend a conference requested on said date by the parent organization, International Association of Machinists, for the purpose of effecting a settlement of the disputed provisions of the proposed collective bargaining agreement, *but the respondent Allen, president of respondent Boeing, on behalf of the company, refused to attend* the conference if Lodge 751's officers and representatives were present or *to discuss the issues which caused the strike,* on the ground he stated that such meeting was not in accord with his understanding of the telegram of the said Brown and that the strike was in violation of Section 8(d) of the Act, and further stated he would only discuss the payment of damages caused by the strike, the action to be taken by the parent organization against the officers of Lodge 751 for calling the strike, and the possibilities of establishing a bargaining agency on a basis which would give the company assurance that there would be no further violations of an agreement or of the Act, as contended by him had occurred. On or about April 28, 1948 the Executive Council of the International Association of Machinists granted official sanction to the strike of Lodge 751 against respondent Boeing." (Emphasis added.)