BOEING AIRPLANE CO. et al. v. NATION-
AL LABOR RELATIONS BOARD.

No. 10064.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 25, 1949.

Decided May 31, 1949.

Messrs. Lowell P. Mickelwait, Seattle, Wash., and Edmund L. Jones, Washington, D. C., with whom Mr. Nelson T. Hartson, Washington, D. C., was on the brief, for petitioners.

Mr. Dominick L. Manoli, Attorney, National Labor Relations Board, Washington, D. C., with whom Mr. A. Norman Somers, Assistant General Counsel, National Labor Relations Board, Washington, D. C., was on the brief, for respondent.

Mr. Gerhard P. Van Arkel, Washington, D. C., was on the brief for International Association of Machinists, as amicus curiae, urging affirmance.

Before CLARK and WILBUR K. MILLER, Circuit Judges, and GEORGE C. SWEENEY, District Judge, sitting by designation.

SWEENEY, District Judge.

This case presents for review a cease and desist order issued by the National Labor Relations Board, the effect of which would compel the petitioners to bargain collectively with the Aeronautical Industrial District Lodge No. 751 and to take certain action, including the reinstatement of all striking employees of the Union. The order was issued as a result of the Board's finding that the petitioners, by refusing to bargain with the Union on and after April 25, 1948, violated Section 8(a) (5) and Section 8(a) (1) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158 (a) (5) and (1).

The Company is a Delaware corporation which on December 31, 1947, succeeded to the business of the Boeing Aircraft Company, and assumed, among other things, the obligations as they then existed under a contract with the Aeronautical Industrial District Lodge No. 751 hereinafter referred to as the "Union." The contract contained a no-strike clause, and it also contained another clause providing that the contract would remain in full force and effect " * * * from the 16th day of March, 1946, to the 16th day of March, 1947, and thereafter until a new Agreement has been reached by the parties either through negotiation or arbitration."

In October, 1946, the Company proposed changes in the existing labor relations agreement, and the Union arranged for negotiations to start in January, 1947. From January to April, 1947, representatives of both conferred three days each week, submitting proposals and terms of a new contract. They failed to agree on changes, and in April, 1947, the Union gave to the Secretary of Labor and to the National Labor Relations Board a Notice of Intention to Strike, under the provisions of the Act of June 25, 1943, 57 Stat. 163, 50 U.S.C.A. Appendix, § 1501 et seq. Later in April, both parties presented to a representative of the United States Conciliation Service their respective positions with respect to the negotiations and the issues in dispute, and a tentative agreement on certain issues was reached but there remained unsettled questions of Seniority, Hours of Labor, and Wages.

In the middle of May, 1947, the Union gave the Company until May 24 to submit a final offer to be put to the Union's members for acceptance or rejection. On May 23 conciliators met separately with the Company and with the Union, and on May 24 the Union members voted to reject the Company's offer and to authorize a strike. Although the strike was authorized it never did occur, and the subsequent conduct of the Union members and officials shows clearly that their intention was abandoned. In October, 1947, the Union was advised of a new offer being prepared by the Company, and in early January, 1948, received it from the Company. Thereafter, repre-

sentatives of the Company and the Union met three times each week in negotiations, and arrived at tentative agreement with respect to all but three of the fourteen Articles proposed by the Company, the three subjects on which no agreement was reached being the same as previously, i. e., Seniority, Hours of Labor, and Wages.

On April 20, 1948, the Union made a proposal to submit to arbitration and disputed provisions, providing that the question of retroactivity of wage awards be decided by the arbitration board, and that in the case of failure of the arbiters designated by the parties to agree on an impartial Chairman, the selection should be made by Cyrus S. Ching, Director of the Federal Mediation and Conciliation Service. This proposal was rejected by the Company.

On the same day, the Union made proposals covering the issues of Seniority, Hours of Labor, and Wages, which it offered: "on condition that, unless this proposal is accepted in whole by you on or before 12 o'clock, on April 21st 1948, it is automatically withdrawn and cannot be used by you in any way in arbitration proceedings, In which case Lodge 751 reserves the right to take appropriate action including a work stoppage." The Company rejected this offer on April 21, 1948, and on April 22 approximately 14,500 members of the Union employed by the Company went out on strike.

On April 25, 1948, the Company notified the Union that it would no longer meet or deal with it, as the Union "is not a collective bargaining representative under the National Labor Relations Act," and since then the Company has refused to recognize the Union as the collective-bargaining representative of the production and maintenance employees of the Company and has refused to meet, negotiate, or deal with it as such. On April 30, 1948, the Union filed with the National Labor Relations Board a charge of unfair labor practices by the Company, under Section 8(a) (1) and (5) of the National Labor Relations Act.

From August, 1947, to April, 1948, the Union filed over 200 grievances under the contract of March 16, 1946; from January 1, 1948, to April 22, 1948, the Union made over 900 employment preference applica-

tions to the Company pursuant to the same contract; on several occasions in 1948 the Union requested leaves of absence for its officers pursuant to said contract.

In order to sustain the decision of the Board, it is necessary to find that the Union did not violate Section 8(d) of the National Labor Relations Act, and that it did not violate the no-strike clause of its contract. Section 8(d) of the National Labor Relations Act, as amended by Act of June 23, 1947, 29 U.S.C.A. § 158(d), reads in part as follows:

"* * * where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification; * * *

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and—

"(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later."

The Board found that by August 22, 1947, the effective date of the Act, the parties "had opened the 1946 contract." The meaning of that quotation is not clear. While the parties had opened negotiations for a new contract which was to succeed the 1946 contract, the 1946 contract in all of its terms was still in effect. The Board

defined the relationship existing between the parties on August 22, 1947, as "an interim collective bargaining contract, i. e., the opened 1946 agreement extended for the period of negotiations on the terms of a new contract." It refers to the interim contract as governing the parties "but based upon a contract which on that date had already been opened for negotiations leading to termination." Such a distinction is unrealistic. There are no grounds in the stipulated facts for any conclusion other than that the contract in effect on August 22, 1947, was the original 1946 contract. It should be borne in mind that these people were not negotiating for the purpose of modifying the 1946 contract; they were negotiating for a new agreement and until such new agreement was reached the 1946 contract was in full force and effect. The Board's finding that there would be no useful purpose served by requiring compliance with the sixty-day notice since these parties were already negotiating a new contract is a gesture of excuse which is not authorized under the circumstances. Congress made Section 8(d) applicable to all contracts which were in effect on August 22, 1947. Its purpose was to provide a cooling-off period prior to a work stoppage. There is no justification for excusing this Union from the operation of the statute. The effect of the Board's decision would be to limit the application of Section 8(d) to those situations where the parties were working under a bargaining agreement but had taken no steps towards negotiating a new and future agreement. Such does not appear to be the intent of the statute as we follow its plain words; neither are we concerned with the suggestion made by the Board that to apply the statute to the facts in this case could compel the statute to have a retroactive effect. This, of course, is not so. The statute was designed to take effect on August 22, 1947, and to be applied to all contracts then in existence. It did not attempt to apply any law retroactively but merely tied itself in to the terms of contracts in force on that date.

The language of the Act is simple, and we conclude that, regardless of the changes proposed, suggested, discussed, or even agreed upon tentatively in the negotiation

for a new contract, the Union was not free to renounce its contract unless it complied with the Act. If in any of its proposals the Union had notified the Company that, unless such proposal was accepted within sixty days the contract would be terminated, it is possible that such notice might be construed to be compliance with the statute. However, that situation did not arise here and it is unnecessary to pass on the point; suffice it to say that the Union in this case gave no notice other than the twenty-four hour notice of April 20, 1948. From these facts, we conclude that the strike was not a lawful strike because of its failure to comply with Section 8(d) of the Act.

The Board has found that the no-strike clause of the 1946 contract was not breached. It found that the 1946 contract had been replaced by an interim contract, but that the terms of the 1946 contract had been carried over into the interim contract, and that the no-strike clause was contained in the interim contract but nevertheless was not breached when the strike occurred. To accomplish this result, the Board was compelled to find that the interim contract had but a reasonable length of time to live, and that it expired sometime before April, 1948, when the strike was called. This does not accord with the facts of the case for on April 20 the Union submitted its last demands to the Company and, had they been accepted instead of rejected, they would have formed the basis of a new contract. In our view the strike of April 25 was a breach of the 1946 contract which was still in force on that date. It is absurd to say that the so-called interim contract died while the parties were still negotiating under it for a new contract. In this connection it may be well to pose this question: on the law and the facts of this case, would the Board have decided that the so-called interim contract had died prior to April 20, 1948, if the Company had declared a lockout of its employees on April 20?

■ The Company was not guilty of an unfair labor practice in refusing to bargain with the Union thereafter. The Union had lost its standing as the collective-bargaining agent and the Company was at liberty to treat the employees as having severed their relations with the Company because of their breach of contract, and it was further at liberty to consummate their separation from the Company's employ by hiring others to take their places. See National Labor Relations Board v. Sands Manufacturing Co., 306 U.S. 332, 344, 59 S.Ct. 508, 83 L.Ed. 682.

■ We agree with the principle of law that a contract of indeterminate duration may become terminable by unilateral action on the part of either party after a reasonable lapse of time. In enacting Section 8(d) Congress specified what the reasonable notice of termination would be, namely, sixty days. In this case the Company was allowed no more than twenty-four hours to consider a proposal containing demands which were far-reaching in their effect upon the Company. The Company did not accept the proposal and the strike occurred. This is not in compliance with the no-strike clause of the contract and, even assuming the existence of an interim contract, it was not sufficient notice under either the 1946 contract or the so-called interim contract.

We are of the view that the Union violated both Section 8(d) of the National Labor Relations Act, as amended, and the no-strike clause of its own contract, and that it forfeited all right to be considered as a collective-bargaining agent for the employees of the Company.

The order of the Board of November 22, 1948, therefore, must be set aside, and

It is so ordered.