**BOEING AIRPLANE COMPANY, a corporation, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 13802.

United States Court of Appeals, Ninth Circuit.

Sept. 23, 1954.

Holman, Mickelwait, Marion, Black & Perkins, J. Paul Coie, F. Theodore Thomsen, Seattle, Wash., for petitioner.

George E. Flood, Wettrick, Flood & O'Brien, John E. Hedrick, Morrissey, Hedrick, Roberts & Dunham, Seattle, Wash., for intervenors.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel; Bernard Dunau, Milton Eisenberg, Attys., N.L.R.B., Washington, D. C., for respondent.

Before STEPHENS, ORR and FEE, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

The National Labor Relations Board issued a decision and order on March 26, 1953, dismissing the major portion of an amended complaint against Boeing Airplane Company but finding violation of the Act, 29 U.S.C.A. § 151 et seq., in certain particulars and ordering the company to cease and desist from certain action and requiring reinstatement and restoration of pay lost by certain employees. Boeing filed here on April 13, 1953, a petition to review and set aside this order. The Board answered and asked enforcement thereof. Two former employees of Boeing intervened here. These are Pepin and Pioli. The Board, based upon the findings of the Trial Examiner, held the termination of employment as to each lawful and refused to reinstate or order restoration of pay as to either. The Board and Boeing each ask that the dismissal of these petitions be affirmed.

The background is instructive. Aeronautical Industrial District Lodge No. 751 was certified by the Board in 1938 as the bargaining agent of the production and maintenance employees. After several agreements between management and this agent, difficulty arose in negotiations for a new contract in regard to wages and seniority. On April 22, 1948, about 15,000 employees went out on strike. Boeing claimed the strike illegal as in breach of the existing contract, and withdrew recognition of 751. Violence and intimidation marked the strike. A group of employees organized Aeronautical Workers, Warehousemen and Helpers, Local 451, AFL, and vigorously attempted to organize new employees and returning strikers. On September 13, 1948, those represented by 751 unconditionally returned to work, although they continued a belligerent attitude toward 451. Out of 8,954 strikers who applied for reemployment through 751, all but 64 obtained positions. The former strikers had hardly got into the plant, when upon September 20, 1948, through its President, 751 filed a charge against the employer embracing Stanley Burrell and John Zavagalia, suspended on September 13, the day the strike ended, for wearing shop committeeman badges; also Doris Cinotto, suspended for three days on September 13, the day the strike ended, for wearing a streamer with the printed words "I was loyal to 751" and a charge that "overtime work was withheld from employees who would not sign Teamster applications." Upon this basis, the proceeding was initiated upon which the order of the Board here under attack was founded. Long after these incidents and after the filing of these charges, the Board, on November 22, 1948, issued an order the effect of which was to declare the strike legal and to compel Boeing to bargain collectively with 751. The United States Court of Appeals for the District of Columbia, in Boeing Airplane Co. v. National Labor Relations Board, 85 U.S.App.D.C. 116, 174 F.2d 938, 991, refused enforcement, upholding the contention of the company that the strike was illegal and 751 no longer represented the employees.

After the return to work, 751 began a vigorous organizing campaign, and 451 did likewise. Organizers for each were accorded equal rights of access by Boe-

ing. The Board certified 751 following an election on November 1, 1949. Since then, 751 and Boeing have had several agreements, and labor relations seem to have been quite amicable.

An amended consolidated complaint was issued June 18, 1951. It was there alleged Boeing discriminated against 259 individuals to discourage membership in 751. Of these, 40 were said to be because they had filed charges against Boeing or because their names were listed in such charges. It was alleged Boeing had, during and after the strike, dominated and supported 451, and had by certain specific acts interfered with its employees. The charges as to Burrell and Cinotto were contained therein. The charge as to Zavagalia and the charge about unlawful assignment of overtime work seem not to have been pressed.

The hearing before the Trial Examiner lasted from July 18, 1951, to September 11, 1951.

The disposition of the charges during the hearing are now set forth. The General Counsel withdrew allegations as to 6 of the 259. The Trial Examiner dismissed the complaint as to 154. The remaining 99 were members of 751 who engaged in the strike, were rehired and thereafter discharged or laid off.

The Trial Examiner filed a voluminous and extremely able report. He found Boeing had discriminated against only 3 of the 99 above mentioned. He found Parezanin was not restored to employment after a proper suspension for cause because he had failed to work during the strike. He found a reasonable disciplinary recommendation for a lay-off of three days for Haworth was turned into a discharge because the latter was "very closely connected with union activities at the plant." As the Burrell, the Examiner found:

"I have accepted as believable and reasonable Respondent's explanation that the atmosphere in the plant for a period following the end of the strike was sufficiently tense and unfriendly as to require the Respondent to impose strict rules of conduct upon employees to avert possible violence and I have considered the case of Stanley Burrell in this light. However, I am unable to agree with the contention of the Respondent that its action in discharging Burrell was reasonably related to the accomplishment of this result. I do not understand how it could be that the wearing of a badge indicating an individual to be a committeeman for a labor organization, even though such office lacked any sanction from the Respondent, was such a manifestation of union adherence as would probably provoke dispute. I find that Stanley Burrell had a right to wear a badge indicating that he had been designated by Lodge 751 as a committeeman and that Respondent's discharge of him when he refused to remove it discouraged membership in and activity on behalf of Lodge 751 and that the Respondent thereby violated Section 8(a)(3) and (1) of the Act."

The Trial Examiner found that 5 employees were able to obtain jobs with the company solely because they were recommended by Teamsters. There were additional evidences of support of 451. In the case of Klein, the company refused, contrary to its accustomed practice, to permit a cancellation of an order to pay dues to 451, where an irrevocable assignment had been given to that Local. Carrig was, the Examiner found, denied a promotion because the Teamsters objected.

The Examiner found nothing illegal in and of itself in Boeing having referred to it for employment prospects who were sent to it by many organizations, including Teamsters. Further, he expressly found that there was "no evidence that" Boeing "dominated that organization [Local 451]." He found that there was no general disposition upon the part of Boeing to violate the Act.

Notwithstanding this positive recognition of the lawful action of Boeing under circumstances of stress, the Examiner made findings that Boeing for a

time following the end of the strike "assisted and supported" the Teamsters.

The Examiner found also:

"Further, to the extent that it did so, I find no unfair labor practice and no unreasonable restriction upon union activity in the rule which some supervisors enforced forbidding the discussion of union matters on Respondent's premises. I believe that such a rule for a period of months following the conclusion of the strike was reasonably related to the Respondent's interest in preserving peace between the competing factions so that production might go on, unhindered by extraneous matters. There is also evidence, which is believed, that Foreman Shanander on more than one occasion told employees that the Lodge 751 button was the wrong one to wear. I do not find this to be an unfair labor practice as it contains no element of coercion.

"I credit the testimony of Dora Schott that Foreman Lawrence commented, in effect, that her demotion was caused by the fact that she wore a Lodge 751 button. I also credit the testimony of Carolyn Scott and Dora Crozier that in August, 1949, Foreman Fred Smith said that members of Teamster Local 451 would have the better chance of retaining employment in an impending layoff. These observations, no doubt, amount to technical violations of Section 8(a)(1) of the Act as they constitute, impliedly at least, threats to employment tenure based upon considerations of union preference or membership. However, in view of their isolated character and that they were uttered by minor supervisors, I make no such finding here. I find no substantial evidence that the employment opportunity of anyone named in the complaint was affected because he filed a charge with the Board."

The Trial Examiner recommended finally that the complaint in all other respects be dismissed.

The Board "has reviewed the rulings of the Trial Examiner and finds no prejudicial error was committed. The rulings are hereby affirmed. The Board has considered the Intermediate Report, the exceptions and briefs, and the entire record in these cases, and hereby adopts the findings, conclusions, and recommendations of the Trial Examiner * * *." This adoption was, however, with certain "additions, exceptions, and modifications."

The Court has made a careful review of the long record and of the Intermediate Report in the light of the extensive briefs filed here. The Court has only the highest praise for the careful and discriminating work of the Trial Examiner. His approach was judicial and his judgment exact. The Board should have accepted his findings without additions, exceptions or modifications. He alone saw the witnesses, and his opportunity to appraise the general situation, the feeling of management and employees, together with the imponderables, cannot be paralleled by either this Court or the Board. This Court affirms the findings of the Intermediate Report in their entirety.

■■ As to the petition in intervention of Pepin and Pioli, the Board and the Examiner concur in findings of fact and conclusions that the dismissal of each was justified and not in violation. The Court, therefore, affirms this view, and dismisses the petition in intervention. A careful review of the record furthermore discloses that the lay-off of Pepin was caused by "reduction in working force," but the motivating cause of his selection for lay-off and the subsequent failure to reemploy him, according to Morrell, Chief Timekeeper, whom the Trial Examiner credited, was his uncooperative attitude in discharging his obligations toward his job. As to Pioli, there is substantial evidence that he was discharged because he called his supervisor a "damned liar."

■ The Court affirms the Board in accepting the findings of the Examiner as to Parezanin, since there was substantial evidence to show the latter was discharged after he was reemployed following the strike because of resentment of management at his failure to work during the stoppage. There was, according to the record, sufficient cause otherwise for his discharge, but the Examiner weighed the testimony and found the other grounds were not the actual motive for discharge.

■ The Court accepts as final the concurrence of the Board with the Examiner as to the illegality of the discharge of Haworth. The evidence indicates that an assistant foreman recommended the suspension of this employee but that the general foreman turned this into a discharge because Haworth "was as that time very closely connected with the union activities going on at the plant there."

■ The Court reluctantly accepts the agreement of the Board and the Examiner as to the suspension of Burrell. Burrell was employed by the company before the strike. He was shop committeeman of Union 751. He was on strike. Upon his return, he was directed by his union to wear his shop committeeman's badge. The foreman of the company asked him to remove it on two occasions. He refused each time. He was suspended on that account. He did not seek employment of the company thereafter, nor was it offered.

There is no question of credibility involved. The Court is of opinion that both Examiner and Board misconstrued a certain reference of the Supreme Court in Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 802, n. 7, 65 S.Ct. 982, 89 L.Ed. 557, which is inapplicable here on the facts. More weight might have been given here to the highly explosive situation where the union, the insignia of which was being flaunted, had just come off a violent strike subsequently declared illegal, had been declared by the company no longer the bargaining agent, and was faced with

a rival union for the first time. The Examiner found expressly that Boeing had not acted improperly during the strike. These actions charged occurred within a few days after the strike ended. The mere fact that 751 won an election eventually should not convict the company of an illegal activity at this transition stage. The Court, however, accepts the agreement of the Board and the Examiner as a finality.

The order for restoration of the three employees, Parezanin, Haworth and Burrell, with back pay, will be enforced together with other concomitants. The Court also concurs that Boeing should be required to cease and desist from like acts.

■ There was an abundance of evidence in the record to the effect that Cinotto, who resigned on March 22, 1949, to take care of her young daughter and failed to obtain reemployment although she tried several times, was refused because of an erratic employment record and because she was absent or tardy without adequate explanation 14 times during the first three months of 1949 and therefore was considered erratic. The Examiner found no relation between this and the incident on the day of her return from strike, September 13, 1948, when she was suspended for three days for wearing the streamer. While it is true in the incendiary atmosphere the company believed "that such slogans were provocative and would tend to disorder", which belief, under the circumstances, the Examiner found to be "a reasonable one," there was no finding of a discriminatory policy by him, based on that incident or any other. Further he found that the suspension of Cinotto and the subsequent failure to reemploy after her voluntary resignation were not violations.

The Board, perhaps misled by the Republic case, considered there was a violation. This Court believes that the attitude and temper of the Examiner were more judicial, and adopts his expression quoted above. The keeping of peace between rival unions was important. and

the Board should have so viewed it. No decided case apparently covers these exact facts or gives color to the position of the Board. The Examiner heard the witnesses and was better able to appraise the situation. It must be remembered that the incident regarding Burrell and that regarding Cinotto occurred within a day or two after restoration to duty subsequent to participation in a violent illegal strike.

With such extremely inflammable materials as the passions of the rival unions, the Teamsters and 751, the wearing of the streamers and shop buttons must be viewed as the spark which might in a second set everything afire again. No doctrine can give immunity to symbols and expressions which are incitements to crime or violent action in breach of peace. Under the circumstances, we conceive the Trial Examiner found these insignia to be of this character. In the emergency, the supervisors did discourage the wearing of these symbols for the time, but there is no justification in the record for the conclusion of the Board that there was a "rule" on either, or that the prohibition lasted beyond the emergency. The Trial Examiner found no discriminatory practice here and this Court concurs therein.

■ Another mistake of the Board relates to Nielsen, who was laid off in a reduction in force in March, 1950. She was not rehired before September 5 of that year, on which day she filed a charge asserting that the company had fired her and refused to reemploy her. The company persisted in declining to reemploy her. The evidence showed she had a poor work record and did much unnecessary talking. The supervisors testified this was the reason she was not reemployed.

The Trial Examiner found that there was no substantial evidence that the failure of the company to rehire Nielsen was unlawfully motivated, in which finding this Court agrees.

■ The Board reversed the Examiner and found that, beginning in September, 1950, and continuing thereafter, the Company failed to rehire Nielsen because she had filed a charge and that thereby Section 8(a)(4) had been violated.

It should be remembered that there were 40 claims in the amended complaint that employees had been discharged or failed to be rehired on account of having filed or been mentioned in charges against the company. These were all dismissed by the Examiner. The Board concurred in all but this one instance. The record shows that the company supervising employers testified as to a sufficient cause for failure to rehire. This reversal of the findings of the Examiner therefore is based upon a failure to credit testimony which he believed,[1] because the reasons of the supervising employees are the reasons of the company. The Court therefore finds no violation of Section 8(a)(4).

A much more flagrant instance of reversal upon grounds of credibility relates to the case of Gerber, a timekeeper, who was discharged on December 7, 1948, for making threats to other employees concerning job status.

The Trial Examiner believed the testimony of Morrell, Chief Timekeeper, that he had received a report from another supervisor that Gerber was threatening his fellow employees that, if they did not join Union 751, they would be out of a position in thirty days, as a result of which, upon investigation of the charge, Gerber was discharged. Obviously, the Trial Examiner discredited the testimony of Gerber, who was an interested party and who testified to some matters which, if he were believed, might throw a different light on the situation.

---

1. "It was erroneous for the Board to reverse the findings of the Examiner upon the credibility which the latter accorded * * * witnesses of respondent." National Labor Relations Board v. Kaiser Aluminum & Chemical Corp., 9 Cir., 217 F.2d 366. Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456.

The Board gave credibility to Gerber and discredited Morrell, although crediting the latter in other instances and although they believed he had no personal anti-751 bias. The position of the Board cannot be sustained, since the record evidence to which they appeal is not in opposition to the testimony of Morrell. Again here, what was to be tried was whether the attitude of management was discriminatory in the discharge. There is hardly a scintilla of evidence to that effect. The activity with which Gerber was charged was not protected. It is then entirely immaterial whether Gerber did threaten other employees or no.[2] In this instance, the Board also credited hearsay testimony of Carrig to support its holding as to Gerber, although the Examiner had given it no weight.

As to the remaining variations from and additions to the Intermediate Report of the Trial Examiner, in all candor the Court is of opinion that the Board felt reverberations and echoes from the previous hearing, upon which it based an order which was denied enforcement by the Court of Appeals of the District of Columbia.

The Board found, contrary to the Examiner, that the demotion of Schott and the layoffs of Haddix, Myrick and McDonald were improper. It is contended by Boeing in the first instance that these complaints should have been dismissed based upon the Statute of Limitations prescribed in Section 10(b)[3] of the Act. As to Schott, the General Counsel took no exception to the findings of the Trial Examiner and Boeing claims that the matter should not have been considered by the Board. No holding is intended here upon these procedural questions. The staleness of these matters may be considered in estimating the equitable standing of the Board in resurrecting them and using them to lay basis for a broad order.

Aside from any technical grounds, in each of these cases the Trial Examiner found that there were isolated acts or expressions on the part of a supervisor which reflected an improper attitude in union relations. The Board affirmed as to the occurrence of such acts or expressions and the Court accepts these findings as conclusive. But in each instance also the Trial Examiner credited the testimony of a foreman or managing employee that the demotion or layoff in question was for a sufficient cause entirely disconnected with the particular incident. Since the state of mind of the employer in the discharge is alone in issue, the question was one of credibility to be given to the witnesses who testified as to what ground the employer based the layoff or discharge. It was therefore found (1) that Schott was demoted for incompetence and voluntarily accepted demotion; (2) Haddix was laid off when there was a reduction in force because of general incompetence and a quarrelsome disposition; (3) Myrick was laid off when there was a reduction in force because of his well established slowness, inefficiency and talkativeness; and (4) McDonald had only one eye and was rated low as an electrician's helper. When there was a reduction in force, he was on that account one of the first chosen for layoff.

The Board in each instance went far afield to draw unwarranted inferences to found a conclusion of discrimination and reverse the findings of the Examiner as to credibility.

The Board affirmed the findings as to the activities of the company in support of Local 451. The Board found four independent violations of Section 8(a)(1) as follows:

The adoption of three different rules:

(a) a rule prohibiting employees from wearing steward and committee buttons;

---

2. Radio Officers' Union of the Commercial Telegraphers Union, AFL v. National Labor Relations Board, 347 U.S. 17, 42–44, 74 S.Ct. 323; National Labor Relations Board v. Kaiser Aluminum & Chemical Corporation, 9 Cir., 217 F.2d 366.

3. 29 U.S.C.A. § 160(b).

(b) a rule prohibiting employees from wearing loyalty streamers;

(c) a rule applied by some supervisors to prevent discussion of union affairs on company property;

and

(d) the remarks of an assistant foreman to two employees evidencing bias in favor of 451.

The Trial Examiner did not find that any of the acts of the company during the strike were contrary to law. The Board seems to have affirmed this.

The Trial Examiner found also that Boeing had not dominated Local 451. Apparently this finding was accepted by the Board.

The Trial Examiner found there was no general policy of discrimination against members of Lodge 751 or that organization. This finding was adopted by the Board. The Trial Examiner found there was no "general disposition to violate the Act," in which the Board seems to have concurred.

Contrary to the recommendations of the Examiner, the Board, based upon its finding of independent violations in addition to those found by the officer who saw the witnesses, issued a broad cease and desist order.

The Court approves the finding that, for a period after the end of the strike, Boeing favored 451. There were five instances found by the Trial Examiner where persons were given employment over others because referred by the Teamsters. One promotion was prevented by them, and, as noted above, one employee was refused permission to withdraw an allocation to 451 under an irrevocable assignment. But the policy of having referrals made in order to find employees was not improper, as both Examiner and Board found. Furthermore, Boeing did not dominate 451 of Teamsters. Again, the Examiner and the Board are in accord.

The Court disapproves of the finding made by the Board, in addition to those of the Examiner, that there were violations of the Act based upon situations developing at the end of a violent and illegal strike when the rival unions were facing each other in the plant. The alleged rule (a) regarding wearing badges by shop committeemen, and (b) relating to streamers, are instanced by Burrell and Cinotto, which have already been discussed. The Court agrees with the Trial Examiner that there were not violations of the Act by these transitory policies. If there were a rule (c) that union business should not for the time being be discussed upon company premises, it would not be a violation of the Act but a salutary precaution.[4] The fact that the Court is of the opinion no such rule was promulgated, but that some minor supervisors instituted this precaution in order to prevent flare-up of previous difficulties, is therefore of no practical importance. Finally, the Court agrees with the Examiner that the remarks of an assistant foreman evidencing bias in favor of 451 were isolated and insignificant and not in violation of the basic statute.

In view of the tremendous magnitude of the strike and the bitterness and violence involved, this Court of of opinion that it is remarkable that, even if it were assumed that all the violations now found by the Board were to be accepted, Boeing was able to keep the great organization from any more acts which the Board would construe as violations. Furthermore, labor peace has reigned for years.

The Trial Examiner was on the ground and had the opportunity to appraise the situation and the necessity which the company faced of preventing other outbreaks. He is able to appraise far better than the Board whether the situation called for the policies promulgated and whether the expressions and restrictions of minor supervisors would be considered willful violations of the Act. His atti-

4. In Republic Aviation Corp. v. National Labor Relations Board, 324 U.S. 793, 65 S.Ct. 982, the Supreme Court was careful to state that a case involving unusual circumstances such as are here present was not before it.

tude was judicial. His judgment was calm and balanced. The Court therefore disapproves the findings of violations by the Board contrary to those of the impartial hearing officer.

 The situation is now brought back to that when the matter was brought up on review from the Trial Examiner. The Board, as a result, apparently, of the findings it made and conclusions which it drew from the record and which have now by this Court been found erroneous, added severe clauses to the order. Normally speaking, this Court is of opinion that the Board should be able to devise the remedies for the evils which exist.[5] It may well be that these more severe clauses would have been justified in the opinion of the Board if the facts had been as they declared them. On the other hand, if the Board had accepted the facts as found by the Trial Examiner, the Board might well have been disposed to accept the recommendations as to remedy made by that officer.

The statute gives this Court power to refuse to enforce these clauses of the order. We choose rather to remand the matter to the Board for reconsideration of the remedy [6] in the light of the facts which we have now established. This Court would rather not impinge upon the power of the Board to select an appropriate remedy after the facts have been established.

It should be kept in mind that, if the Board chooses not to place broad sweeping clauses in effect, the corrective remedies remain in their hands. If broad

clauses are ordered enforced by this Court, violations thereof are also in the hands of this Court for punishment or condonation.

This part of the order is remanded for reconsideration. However, the Court will enforce the portions of the order relating to Don J. Parezanin, Stanley Burrell and Jack E. Haworth, and so much of the cease and desist clauses as conform to the recommendations of the Trial Examiner as set out on pages 224, 225 and 226 of the Record.

5. In a recent case in which the findings were clearly supported by the evidence, this Court stated that it would not "examine the question of whether the methods and devices selected by the Board as adequate to cure the situation are in fact necessary", and enforced the order. National Labor Relations Board v. Cleff, 9 Cir., 214 F.2d 1, 2.

6. Although the statute gives courts of appeals the power to modify or to set aside in whole or in part the order of the Board, 29 U.S.C.A. § 160(e), this Court and others have respected the competen-

cy of the Board in framing remedies by remanding cases for reconsideration by it, especially where the findings of the Board were not approved. Leonard v. National Labor Relations Board, 9 Cir., 197 F.2d 435; National Labor Relations Board v. Leland-Gifford Co., 1 Cir., 200 F.2d 620, 626; American Newspaper Publishers Association v. National Labor Relations Board, 7 Cir., 190 F.2d 45, 48. See also Regal Knitwear Co. v. National Labor Relations Board, 324 U.S. 9, 13, 65 S.Ct. 478, 89 L.Ed. 661.