FOOD HANDLERS LOCAL NO. 425, AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFL-CIO, Plaintiff,

v.

ARKANSAS POULTRY COOPERATIVE, INC., Defendant.

Civ. A. No. 1613.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Dec. 15, 1961.

Anthony J. Sabella, Memphis, Tenn., Lem C. Bryan, Fort Smith, Ark., for plaintiff.

Charles R. Garner, Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

On May 19, 1961, plaintiff filed its complaint against defendant seeking to restrain and enjoin defendant from violating a collective bargaining agreement, alleged to exist between plaintiff and defendant, by refusing to arbitrate the differences, disputes and complaints between plaintiff and defendant in connection with the discharge of one Arlie Bray, and that the court order the defendant to submit said differences, disputes and complaints to arbitration in accordance with the terms of the agreement.

On August 1, 1961, defendant filed its answer in which it admitted that a collective bargaining agreement was entered into on August 20, 1958, between plaintiff and defendant, and that the agreement covered such matters as hours, wages, rates of pay, dues deduction, job posting, seniority and discharges, but denied that the agreement was renewed and extended or that it was in force and effect after November 15, 1959, the date of expiration fixed by the terms of the contract.

The defendant alleged that the agreement contained a termination clause allowing either party to terminate said agreement by giving to the other 60 days notice prior to November 15, 1959, and that the plaintiff gave defendant notice of cancellation and termination by letters of September 5 and 8, 1959; that after said notice was given to the defendant, the parties entered into negotiations in an effort to agree upon the provisions of a new collective bargaining agreement, which meetings were held intermittently until April 17, 1961, at which time negotiations were terminated.

The defendant admitted that it discharged one Arlie Bray on or about January 31, 1961, and alleged that it bargained in good faith with plaintiff relative to such discharge, but denied that the collective bargaining agreement dated August 20, 1958, was in full force and effect as of January 31, 1961.

The case proceeded to trial to the court without a jury on November 13, 1961, and at the conclusion of the testimony and arguments of counsel for the respective parties, the case was submitted and taken under consideration, and now, having considered the ore tenus testimony of the witnesses with the exhibits to said testimony, and the briefs submitted in support of their respective contentions, this opinion is filed embodying the findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A.

The plaintiff is an unincorporated association, a labor organization and trade union engaged in representing employees for the purposes of collective bargaining, having its main office in Fayetteville, Arkansas.

The defendant is a corporation duly organized and existing under the laws of the State of Arkansas, with its principal place of business at Bentonville, Arkansas, and is engaged in the processing of poultry.

The employees of the defendant had prior to August 20, 1958, been represented for several years by the plaintiff labor organization under a written contract. The last written agreement was entered into by the parties on August 20, 1958, and provided that it should be in full force and effect from July 21, 1958, to November 15, 1959, and that if the agreement was not canceled upon 60 days written notice prior to the anniversary date, it would be considered to be in full force and effect for each succeeding contract year.

On September 5, 1959, the president of the plaintiff wrote the manager of the defendant as follows:

"Please accept this letter as notice of our desire to terminate the Labor Agreement between our organization and your company, covering the employees at the Bentonville plant. Such termination is for the purpose of negotiating a new agreement.

"This is the 60 day written notice required by the labor agreement now in effect.

"We shall be pleased to meet with you at your earliest convenience for the purpose of completing negotiations of a new labor agreement to replace the present one, prior to its expiration date."

On September 8, 1959, another letter was written by the president of the plaintiff to the manager of the defendant only for the purpose of substituting the word "cancel" for the word "terminate" in the letter of September 5, 1959.

The contract was introduced in evidence as plaintiff's Exhibit 1, and contained provisions fixing the hours, wages, rates of pay, and working conditions. It also contained provisions for job posting, seniority, and seniority lists, grievance procedure, insurance payments and check off of dues. After the notice of cancellation was given by plaintiff, the parties proceeded to negotiate from time to time, but were unable to agree upon a new contract. The chief question in dispute was wages.

Many, if not all, of the other poultry processors in northwest Arkansas, whose

employees were represented by plaintiff, entered into new contracts with the plaintiff providing for a wage raise in various amounts, but the defendant took the position that it was financially unable to pay any higher wages than those scheduled in the written contract which had been canceled by plaintiff.

During all of the negotiations between the parties the defendant continued to deduct or check off the dues of the various employees, maintained a seniority list, and settled some minor grievances.

Since the parties were unable to agree upon a new contract, the president of the plaintiff on September 16, 1960, submitted another letter (Plaintiff's Ex. 5), to the then manager of the defendant, in which he stated:

"Inasmuch as the agreement between our organization and your company has been extended and the common expiration date is November 15, please accept this letter as notice that we desire to cancel the agreement now in effect for the purpose of negotiating a new agreement. We desire to meet and consummate a new agreement prior to the expiration date.

"This is the 60 day notice required by Article XII of the agreement now in effect."

On January 31, 1961, prior to the termination of the negotiations, the defendant discharged the employee, Arlie Bray. The president of the plaintiff wrote the manager of the defendnt on February 2, 1961 (Plaintiff's Ex. 8), as follows:

"Please accept this letter as notice that our organization is submitting the grievance for the discharge of Arlie Bray to arbitration. It is my understanding from our telephone conversation, today, that you are refusing to re-instate this employee.

"We contend the accident that occurred on January 31, 1961, was not just cause for discharge.

"It is also my understanding of the telephone conversation, that you are willing to waive Article 3–A of the Agreement now in effect. We would be agreeable to use as arbitrator a professor from the University of Arkansas, who has had considerable experience in this work.

"May I hear from you at your earliest convenience."

On February 6, 1961, the manager of the defendant wrote the president of the plaintiff (Plaintiff's Ex. 9), in which he stated:

"Received today your letter of the 2nd with regard to discharge of Arlie Bray.

"I have no objection to waiving Article 3–A of the agreement and use a suitable arbitrator.

"As a matter of suggestion and with your consent and approval, I would be willing to have the matter arbitrated by any competent judge in this area. I presume Fayetteville has a circuit judge, chancery judge or for that matter, Washington County judge. If this could be worked out to the convenience of any of these above mentioned judges, we would be happy to come down and hear the matter at their and your convenience.

"With regard to our discussion of wage negotiations with you and our Board of Directors, you and I set a tentative date of February 17. I still feel that that will work out O.K. Normally, we have our board meeting on the 3rd Wednesday, which would be the 15th, however, I'm suggesting to the board that we have the regular monthly meeting on Friday the 17th and our meeting on this matter could be handled following the regular monthly board session.

"So assuming it's O.K. with you and we encounter no difficulty with the board members, the meeting will be set for 2 P.M., Friday, February 17, here at the office."

On February 8, 1961, the president of the plaintiff again wrote the manager of the defendant (Plaintiff's Ex. 10), as follows:

"With reference to your letter of February 6, 1961, concerning the picking of an arbitrator to hear the grievance concerning the discharge of Arlie Bray, we cannot agree to use the judges mentioned in your letter, as it is a practice with us to use men who are skilled, professional arbitrators.

"We would therefore suggest that we be permitted to write the Federal Mediation and Conciliation Service for a list of five names and that we subsequently strike names from said list until one name remains. This is the method we use in other poultry agreements.

"Your suggested date for the meeting on February 17, 1961 with the Board of Directors, is agreeable with us.

"May we hear from you concerning the picking of arbitrator as we have suggested."

On March 21, 1961, the president of the plaintiff wrote the attorney for the defendant (Plaintiff's Ex. 11), as follows:

"Mr. James A. Gilker, Attorney
3015 Rogers Ave.
Fort Smith, Ark.

"Dear Sir:

"Reference to our meeting on March 17, 1961 and your suggestion that we each submit three arbitrators, in which one is to be chosen to arbitrate the discharge of Arlie Bray, we submit as follows:

Henry W. Hoel
Stillwater, Oklahoma
Wilber C. Bothwell
Springfield, Mo.
Ralph C. Barnhart
Fayetteville, Ark.

"We will contact you for the purpose of selecting an arbitrator as soon as we receive your list."

It should be noted in Exhibit 9 that the manager of the defendant referred therein that the tentative date of February 17, 1961, for resuming negotiations would be satisfactory.

Article III-A is the article that prescribes the grievance procedure. However, it does not seem necessary to copy the article since its provisions were waived by both parties.

Article III-B is as follows:

"Section 1:—Differences of opinion or disputes between representatives of the Company and any employee or Union representative regarding interpretation or alleged violation of any provision of this contract may become the subject of arbitration only after all steps of the grievance procedure have been utilized and have failed to produce an agreement between the parties.

"Section 2:—It is understood and agreed that only violations of the terms of this Agreement shall be subject to arbitration. The arbitrator shall have no power to add to, or substract from or modify any of the terms of any agreement, nor shall the arbitrator have power to set wages or standards of production, nor to change any existing job rate, nor to rule on any dispute regarding work standards. The arbitrator shall have no authority to make an award which by its terms shall require the Company to make redress prior to the effective date of this Agreement. The matter of retroactivity in compensation cases shall be left to the discretion of the arbitrator. In all other cases the decision of the arbitrator shall be effective as of the date the decision is rendered.

"Section 3:—Any case appealed to the arbitrator on which he has no power to rule shall be referred back to the parties without decision.

"Section 4:—The decision of the arbitrator shall be final and binding on both parties. The parties shall select one arbitrator who would be mutually acceptable to both sides. The parties shall share equally the cost of arbitration procedure except

the expense of witnesses or a counsel needed by either of the parties."

It will be noted that the above article on arbitration does not set forth the procedure to be followed in the selection of an arbitrator other than Section 4 provides: "The parties shall select one arbitrator who would be mutually acceptable to both sides. The parties shall share equally the cost of arbitration procedure except the expense of witnesses or a counsel needed by either of the parties."

In plaintiff's letter of February 2, 1961, hereinbefore set forth, it suggested that the parties use as an arbitrator a professor from the University of Arkansas, but in the letter of defendant dated February 6, 1961, the defendant stated that it would be willing to have the matter arbitrated by any competent judge of the area, and if this could be worked out to the convenience of any judge in the area, that then the parties could go before the judge at his convenience.

In the letter of February 8, 1961, the plaintiff refused to agree to the appointment of a judge as arbitrator, and suggested that the parties be permitted to write the Federal Mediation and Conciliation Service for a list of five names, from which an arbitrator might be selected. Later the plaintiff submitted to the attorney for the defendant a list of three names (see Plaintiff's Ex. 11), including one professor of the University of Arkansas. Thus, the parties apparently could not agree upon the selection of an arbitrator, and apparently no other efforts were made by either side to arbitrate the questions relative to the discharge of the employee, Arlie Bray, and the matter remained in that status.

The last meeting between the parties occurred on April 17, 1961, and on that date the defendant advised the plaintiff that it no longer recognized plaintiff as the bargaining agent and demanded a labor board election. The election was held, and the plaintiff was again certified as the representative of the employees, but from that date, April 17, the defendant did not in anywise recognize that there was any agreement of any kind in force and effect.

The plaintiff on page 3 of its brief states:

"The sole issue is whether at the time the discharge of Arlie Bray occurred there was in force and effective a collective bargaining agreement requiring defendant to arbitrate the discharge and which could be enforced under Section 301(a) of the Labor Management Relations Act of 1947."

The defendant on its brief states the issues as follows:

"1. Was a labor agreement requiring defendant to arbitrate the discharge of an employee in effect on January 31, 1961?

"2. If so, was such agreement enforceable under Section 301(a) of the Labor Management Relations Act of 1947?

"3. If such agreement was in effect did not the proposed offer to arbitrate before a judge in Benton County, Arkansas constitute performance of its part of the agreement by defendant?"

The court has jurisdiction of this cause under Sec. 301, Labor Management Relations Act, 29 U.S.C.A. § 185(a). See, also, Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1956).

The general rule pertaining to the construction and termination of collective bargaining agreements is well stated in 31 Am.Jur., Labor, Secs. 101, 110, 111, and 112, as follows, beginning at page 469:

"Sec. 101. Generally.—The general rule is that collective bargaining agreements should not be construed narrowly and technically, but accorded the same liberality which is given to other agreements in order to accomplish their evident purpose, which ordinarily is to protect both the employer and the employee.

Extrinsic evidence in aid of interpretation may be admitted in accordance with the general rules.

\* \* \* \* \* \*

"Sec. 110. Termination.—A collective labor agreement may terminate pursuant to a clause therein providing for its termination as of a specified date. \* \* \*

"Within limitations and restrictions, such collective agreement may be voluntarily terminated. The character of conduct necessary for bringing to an end a collective labor agreement, by mutual act or understanding of the parties themselves, assuming they comprise the employer and a union representing his employees, depends largely upon the terms of the agreement. In general it may be stated that in the absence of governing provisions in the agreement, or violation of such provisions as may exist, such action is permissible, and its establishment and effect will be considered by the courts from the standpoint of the general law of contracts. An agreement respecting certain terms of an existing collective labor agreement has been held not to amount to a termination thereof if it contains nothing indicating an intention to abandon the established scheme, except with relation to a particular subject or part thereof upon which the parties agree. Under the amended National Labor Relations Act a collective agreement, once negotiated, may not be terminated by either party until after a 60-day notice of the notice of the intent to terminate has been given to the other party.

"Sec. 111. Automatic Renewal Clauses.—It is difficult to formulate general rules for the construction of automatic renewal clauses, since the wording in them varies and must necessarily govern the interpretation which the courts will place on them. When a collective agreement provides that it shall be automatically renewed from year to year except upon the giving of a prescribed notice, some affirmative action on the part of an employer or the union is necessary to terminate it. \* \* \*

"Sec. 112. Effect of Proposal to Modify Contract.—The courts are not in agreement as to the effect of a proposal to change an existing contract which has an automatic renewal clause, some holding that notice of a desire to make changes serves to stop the operation of the clause, discussed above, which provides that the agreement will be renewed unless notice to terminate is given within the time prescribed, especially if the changes proposed are substantial, so that the contract is terminated upon the failure of the parties to agree upon new terms. Others have held that nothing short of actual notice to terminate will have that effect."

See also Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309, rehearing den. 351 U.S. 980, 76 S.Ct. 1043, 100 L.Ed. 1495; Boeing Airplane Co. v. N. L. R. B., 85 U.S.App. D.C. 116, 174 F.2d 988 (9 Cir. 1949); Boeing Airplane Co. v. Aeronautical Industrial Dist. Lodge No. 751, of International Ass'n of Machinists, 91 F.Supp. 596 (D.C.Wash.1950), aff'd 188 F.2d 356; Annotation 17 A.L.R.2d 754.

■ Turning to the facts of the instant case, there is no doubt but that the intention of the parties was to terminate or cancel the collective bargaining agreement between them, the anniversary date of which was November 15, 1959, for purposes of negotiating a new agreement. There was no mention made of any intention on either side to modify the existing agreement, and the letters from the union to the employer dated September 5 and 8, 1959, recited on their face that they were the written notice required by Article XII of the agreement to effectuate its cancellation. The court is of the opinion that not only did the parties to the above agreement not in-

tend to modify the written agreement, but it was their intention to cancel and begin anew with a substantially different written agreement. Even if there is some possibility that certain provisions of the agreement survived the date of cancellation, the letter sent by the union to the employer, dated September 16, 1960, effectively canceled what was purported to be an extension of the original agreement.

Therefore, the grievance arising from the discharge of the defendant's employee, Arlie Bray, on January 31, 1961, not only occurred after the two letters of cancellation of September 5 and 8, 1959, had been sent, but more than four months after the letter of cancellation of September 16, 1960, was sent to the defendant employer by the union.

Although the plaintiff union does not deny that there was a cancellation of the prior written agreement, it contends that there was a valid oral agreement existing at the time that the present dispute arose, and it cited the cases of Hamilton Foundry & Machine Co. v. International Molders & Foundry Workers Union of North America, 193 F.2d 209 (6 Cir. 1952), and Wilson & Company, Inc. v. N. L. R. B., 115 F.2d 759 (8 Cir. 1940), to support the proposition that the National Labor Relations Act does not require that collective bargaining agreements be reduced to writing and be signed in order to be valid. It is true that the above-mentioned cases stand for that generally accepted proposition, but it is to be noted that both of these cases and others holding the same way presuppose some circumstances which establishes the oral agreement for purposes of bridging a period of negotiation or renegotiation, whether it be a provision of a prior written agreement or a formal oral compact between the parties. In the present case, there was neither of the above circumstances which would indicate to the court that the union and the employer had provided for such an oral agreement to bridge the interim period of negotiation between the cancellation of the written agreement on November 15, 1959, and

the signing of a new written agreement. It is true that the parties had settled minor grievances, had negotiated the process of arbitration of the present agreement, and had continued the check off of union dues during the period from November 15, 1959, and April 1961. As for the settlement of the minor grievances and the check off of the union dues, there is no indication that these acts were done in reliance on any existing agreement, but rather were carried on as a routine or customary practice of which there was no compelling reason for either party to alter. As for the steps taken in the arbitration of the present dispute, the fact remains that although the parties referred to the provisions of Articles III–A and III–B of the prior written agreement as a modus operandi, they were not restricted in their choice of procedures outside of what the plaintiff referred to as "the agreement now in effect" in its letter to the employer dated February 2, 1961. Specifically what was "the agreement now in effect," if any, has not been clearly established.

A situation analogous to that in the present action was presented in the case of Paterson Parchment Paper Co. v. International Brotherhood of Papermakers, 191 F.2d 252 (3 Cir. 1951), cert. den. 342 U.S. 933, 72 S.Ct. 376, 96 L.Ed. 694, rehearing den. 342 U.S. 956, 72 S.Ct. 625, 96 L.Ed. 710, in which the alleged breach was a strike called on August 20, 1948, which lasted until November 20, 1948. The contract in that case was to be in effect from August 15, 1947, to August 15, 1948, and Sec. 15, the termination clause, was worded in the same manner as Article XII of the contract in the present case. The only difference was that this Sec. 15 contained a second paragraph which provided as follows:

"However, should there be a delay in negotiating the new agreement, this agreement shall remain in full effect until such time as a new agreement is completed."

The union in the Paterson case gave written notice to terminate on June 1, 1948, which was of the same nature as

the letters sent by the union in the present case, dated September 5 and 8, 1959, and at the date of the strike's commencement the parties' negotiations had not resulted in a new agreement. The court in the Paterson case held that there was no valid existing contract at the time of the commencement of the strike, and at page 254 of 191 F.2d stated:

"The union's letter states that it is tendered as 'notification in compliance to the sixty (60) days notice stipulation.' This clearly means notice of termination under Section 15 of the contract. Plaintiff has attempted to make this meaning doubtful. But in the circumstances we find nothing except Section 15 to which this language can sensibly refer.

"Intended as notice of termination, the words used are adequate for the purpose. It is true the notice envisages a continuing labor-management relationship between the parties, but under a new contract to be negotiated in the two months available before expiration of the old contract. As concerns the old contract, the notice is a plain manifestation of unwillingness to continue under its provisions beyond its potential expiration date.

"It is also necessary to consider the meaning and effect of the language of the second paragraph of Section 15 of the contract that 'should there be a delay in negotiating the new agreement, this agreement shall remain in full effect until such time as a new agreement is completed'. The language follows immediately after the provision for 60 days notice of termination on a contract anniversary. It is obviously directed at the avoidance of a no contract situation where pending negotiation of a new contract continues beyond the notified termination of the old. It is phrased only in terms of a successful negotiation. It leaves to inference the result of unsuccessful negotiation.

"But the correct inference is not hard to draw. Negotiation is set up as a factor suspending or postponing the normal effect of notice of termination. The end of negotiation, whether success or failure, marks the end of this postponement.

"It may not always be easy to say when negotiations for a new contract have failed and ended. But no such difficulty exists here. Before the strike was called both parties had recognized that further discussions would be futile. They had broken off their long continued meetings with the understanding that they would not meet again. In recognition of the impasse and its likely consequences, they had discussed and arranged for maintenance essential to plant security in the event of a strike. It is a fact clear on this record that negotiations toward a new contract had failed and come to an end.

"In summary, the contract here required 60 days notice of termination, and appropriate notice was given. But, also in accordance with the contract, termination was suspended by negotiations toward a new contract. These failed and ended. The old contract thereupon terminated pursuant to the permitted election already made manifest by timely notice as provided in the document itself. The obligation not to strike, like the other obligations of the contract ceased to exist."

The rule in the above case would extend a collective bargaining agreement, canceled or terminated by written notice, beyond its date of expiration for purposes of maintaining tranquillity and order during the period of negotiation between labor and industry, if the agreement itself so provided in its termination clause and if negotiations themselves bore fruit after a reasonable period of time from the date of written notice of termination. In the present case neither did the agreement provide for its extension after

timely written notice of cancellation, nor did the negotiations between the parties result in a new written agreement after having been prolonged for a period of over 18 months.

The court is of the opinion that no valid collective bargaining agreement, either oral or written, existed between the plaintiff union and the defendant employer at or subsequent to the time when Arlie Bray was discharged on January 31, 1961.

Therefore, judgment is being entered today dismissing the plaintiff's complaint and assessing costs against plaintiff.